Curtis JACKSON, W. C. McClendon, Lige Scretchen, Nathaniel Cooper and W. E. Parker, Plaintiffs-Appellees, Cross-Appellants,

v.

SEABOARD COAST LINE RAILROAD COMPANY, Defendant,

Brotherhood Railway Carmen of the United States and Canada, Defendant-Appellant, Cross-Appellee.

Curtis JACKSON, W. C. McClendon, Lige Scretchen, et al., Plaintiffs-Appellees,

v.

SEABOARD COAST LINE RAILROAD, CO., Defendant,

Brotherhood Railway Carmen of the United States and Canada, Defendant-Appellant.

Nos. 80–7846, 80–7965.

United States Court of Appeals, Eleventh Circuit.

June 17, 1982.

---

Mulholland & Hickey, Thomas A. Woodley, Edward J. Hickey, Jr., Washington, D. C., Oliver, Maner & Gray, Savannah, Ga., for Brotherhood of Ry. Carmen.

Fletcher Farrington, Savannah, Ga., for Curtis Jackson et al.

Before VANCE, KRAVITCH and CLARK, Circuit Judges.

KRAVITCH, Circuit Judge:

The Brotherhood Railway Carmen of the United States and Canada [Brotherhood] appeals from the district court's finding that the union violated Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 253, *as amended* (codified at 42 U.S.C. § 2000e et seq. (1976)), by participating in racially discriminatory promotion practices. Appellant urges us to reverse the judgment on the grounds that the district court 1) lacked jurisdiction over the plaintiffs' Title VII claims; 2) erred in not finding that the alleged discrimination resulted from a *bona fide* seniority system protected from attack under § 703(h) of the Civil Rights Act of 1964; 3) applied the wrong legal standards in finding that the Brotherhood violated Title VII; 4) resolved issues of material fact on summary judgment and 5) improperly refused to permit a

Brotherhood witness to testify. In addition, the Brotherhood appeals from the district court's denial of its motion under Fed. R.Civ.P. 60(b) to set aside the back pay award, arguing that the court abused its discretion in denying its motion.[1] Appellees cross-appeal from a jury verdict for the Brotherhood on their claims brought under 42 U.S.C. § 1981, on the ground that the district court erred in not directing a partial verdict for the appellees. Finding the parties' contentions without merit, we affirm the decisions of the district court.

## I. *Factual Background*

Since the 1940's, the Brotherhood Railway Carmen of the United States and Canada has represented those employees at Seaboard Coast Line Railroad's [SCL's] Waycross, Georgia Car Department, whose

task is to maintain and repair the railroad's rolling stock. Craft members include carmen, carman apprentices, helper apprentices, and carman helpers. Carmen are the highest paid members of the craft. The only promotion as of right to the carman position accrues to carman apprentices and helper apprentices. Carman apprentices are hired under a formal apprenticeship agreement, which contemplates a four year training period. Helper apprentices serve two years as carman helpers and then enter the carman apprenticeship program with one year of credit toward satisfying the apprenticeship requirements. Carman helpers assist carmen and carman apprentices and receive no credit toward becoming carmen, regardless of their length of service.[2]

---

1. The Brotherhood timely filed separate appeals from the district court's final judgment (No. 80–7846) and from its order denying appellant's Rule 60(b) motion to set aside the back pay award (No. 80–7965). We consolidated the appeals for convenience of the parties on March 20, 1981.

2. In its order denying the parties' motions for summary judgment, the district court described the relevant portions of the collective bargaining agreement between the Brotherhood and SCL, effective 1968:

The Brotherhood of Railway Carmen of the United States and Canada is a craft union representing employees with various job titles performing worked assigned to the carman's craft, *i.e.*, the maintenance and repair of the Railroad's rolling stock. *See* Collective Bargaining Agreement (hereinafter Agreement) Rule 100. The highest paid worker in the craft is the carman. Other job classifications within the craft include carman helper, carman apprentice, and helper apprentice.

The only promotion of right to the carman's rank accrues to the carman apprentices. An apprentice is hired under a formal apprenticeship agreement which contemplates a four-year training period designed to prepare the apprentice for the job of carman. During the first three years of this training period, the apprentice's wage rate is less than that of a helper; but, if the apprentice successfully completes the training period, he is entitled to carman's job when a vacancy arises which cannot be filled by a furloughed carman. The apprentice establishes carman seniority on the first day of compensated work as a carman. Agreement, Rules 46a– 46p and 46v.

The carman helper's job is to assist the carman and his apprentices. Agreement, Rule 102. A natural progression from helper to carman is not contemplated by the collective bargaining agreement, and the helper has no real expectation of being promoted permanently to carman, though at the discretion of the Railroad he may be "set up" or temporarily promoted when the Railroad has more carman vacancies than it can otherwise fill. If a helper logs enough hours as a "set up carman," he is entitled to establish carman seniority. When working as a "set up carman," a helper is paid carman's wages, though he earns no carman seniority. The Railroad can "set back" the helper when it no longer requires his services as a carman. Agreement, Appendix F. The Railroad has not hired anyone as a carman helper at its Waycross, Georgia Car Department since 1952.

After two years a helper may become an apprentice, and his two years as a helper count as one year of the four-year training period. When a helper becomes a "helper apprentice," he is governed by the same rules which govern apprentices. Agreement, Rule 47.

When the Railroad decides that it needs more carmen, it looks first to furloughed carmen and then to apprentices who have completed their training. If these sources cannot fill the Railroad's needs, it will temporarily promote ("set up") employees to carmen in the following order of preference:

(1) regular apprentices who have completed three years or more of their apprenticeship;

(2) helper apprentices who have served two years or more of their apprenticeship;

(3) helpers who have had more than four years experience in their craft and are com-

A carman helper can qualify for the carmen's roster by serving 8320 hours, approximately four work years, as a temporary— "set-up"—carman.

Appellees, all of whom were black, were hired by the Atlantic Coast Line Railroad [ACL], SCL's predecessor, in the early 1940's and have for the most part served as carman helpers since 1950.[3] When appellees were first hired as carman helpers, blacks could not obtain jobs as carmen, carman apprentices, or helper apprentices. Although both blacks and whites were employed as carman helpers, only the white carman helpers were admitted into the helper apprenticeship program. In other words, blacks could obtain jobs in the carman craft only as carman helpers—the position of lowest standing in the craft and the only position offering no opportunity for advancement. Nevertheless, in the early 1950's a few black carman helpers were promoted to the position of carman at the insistence of Roy F. Osborne, chairman of the grievance committee of the local union, who believed it unfair that qualified blacks were not permitted to join the carmen's roster. After Osborne retired from that position, the union never again requested the railroad to promote black carman helpers to carmen.

In 1955, the railroad ceased hiring carman helpers. By 1960, all of the white carman helpers who so desired had been promoted, leaving the job of carman helper to the exclusive dominion of black employ-

---

petent to perform the work for which they are desired;
(4) regular apprentices who have served one year of their apprenticeship;
(5) helper apprentices who have served one or more years of their apprenticeship;
(6) helpers who have had three or more consecutive years experience as helpers.
Agreement, Appendix F. As the railroad's need for carmen subsides, or as carmen become available to displace "set up carmen," reductions are made in the reverse order. Apprentices who complete their apprenticeship while working as "set up carmen" either continue working as carmen or are furloughed according to their position on the carmen's seniority roster and to the Railroad's needs.

When a helper works 8,320 hours as a "set up carman," he is entitled to establish carman seniority. If he does so, he is no longer subject to being "set back" though he may be furloughed like any other carman. To establish carman seniority in this fashion the helper must relinquish his helper seniority. Agreement, Appendix F.

**3.** Appellee Jackson first became a helper in 1942 and worked in that position until 1943, when he became a brakeman. He was furloughed as a brakeman in 1951 and returned to his job as a carman helper or "set-up" carman until he was furloughed in 1960. Jackson worked as a laborer in the freight house from 1962–1969 and as a switchman from 1969–1971. Since 1971, he has worked as a carman helper or "set-up" carman.

Appellee Scretchen became a carman helper in 1941 and worked in that capacity or as a "set-up" carman until 1971. That year, he worked for a short while on a wrecker crew, and in 1972, he returned to his carman helper position. Scretchen qualified for the carmen's roster in 1978 by serving 8320 hours as a "set-up" carman and passing the car inspector's test.

Appellee Cooper became a carman helper in 1943 and remained a helper or "set-up" carman until furloughed in 1960. From 1961 until 1966, he worked as a laborer on the scrap dock and then returned to his position as a carman helper. In 1971, he was "set-up" to carman, and by 1974, he had served the requisite 8320 hours as a "set-up" carman to qualify for the carmen's roster. Cooper was never placed on the roster, however, because he did not take the car inspector's test. The district court found that prior to 1964, no carman had been required to take an inspector's test.

Appellee McClendon also became a carman helper in 1943. He worked in that position or as a "set-up" carman until 1960 when he was furloughed. In 1963 he was rehired as a laborer in the engine house, and six years later, in 1969, returned to the car department as a helper and served in that position or "set-up" carman until he retired on April 4, 1979.

Appellee Parker became a carman helper in 1950 and worked as such until 1960, when he was furloughed. Unlike the other plaintiffs, he was not temporarily "set-up" as a carman in 1955. After remaining laid off for three years, Parker got a job as a laborer in the engine room and remained there until 1971 when he returned to the car department as a helper. Except for a two year period during which he was out of work due to a back injury, Parker remained a carman helper or "set-up" carman.

In response to appellees' motion for a preliminary injunction, all of the plaintiffs were "set-up" to carmen by the SCL on April 18, 1977 and have remained in that position.

ees—the appellees and a few others. The district court found that as of 1960, each appellee was qualified to serve as a carman. In 1955, when business was booming, all of the appellees except Parker were set-up to carmen and performed satisfactorily until demoted to their carman helper positions when work slowed down. Appellee Parker learned the carman's trade during the decade from 1950–60 while working as a carman helper. Thus, appellees were not relegated to the position of carman helper because they were unqualified.

In 1960, all of the appellees except Scretchen were laid-off from their positions as carman helpers and except for Cooper and McClendon remained furloughed throughout the decade. See note 3 supra. During the decade, however, two events significant to this action occurred. First, in 1965, in response to the Civil Rights Act of 1964, the railroad began hiring blacks into its carman apprenticeship program. The Brotherhood asserts that the appellees were offered the opportunity to become apprentices; however, the appellees testified at trial that they had received no such offers. Second, in 1967, the Atlantic Coast Line Railroad merged with the Seaboard Airline Railroad to form the Seaboard Coast Line Railroad. Shortly thereafter the Brotherhood and SCL entered into a new collective bargaining agreement, effective 1968, which contained many provisions similar to those in collective bargaining agreements between the union and SCL's predecessors. See note 2 supra. For example, Appendix F detailed the scheme for advancement to the position of carman as described above, as well as the manner in which shortages in the carman position were to be filled. It provided for the continued automatic promotion of carman apprentices and helper apprentices to the position of carman and retained the requirement that carman helpers serve 8320 hours as set-up carmen before qualifying for the carmen's roster. This latter requirement affected only black employees, including appellees, all of whom were hired as carman helpers prior to 1952. It also effectively precluded appellees from advancing to carmen even though they were

qualified to serve in that position. A union official testified that the Brotherhood could have negotiated to modify the existing promotion system to permit qualified carman helpers to advance to the ranks of carmen without first serving 8320 hours as set-up carmen but did not. In fact, in negotiating Appendix F, the Brotherhood insisted on a new promotion provision that gave the union more control over the railroad's decisions regarding the promotion and demotion of employees.

As the 1960's came to a close, the appellees began to return to their positions as carman helpers. Appellee Cooper returned to his position in 1966, McClendon returned in 1969 and the remaining appellees returned in 1971. In 1971, the appellees were temporarily set-up to carmen and performed satisfactorily. Soon thereafter they began to inquire whether they would ever be promoted. By 1971 some of the plaintiffs had been with the railroad for thirty years and all had been there twenty years. Nevertheless, they were told that they could be promoted only after serving 8320 hours as set-up carmen as required by the collective bargaining agreement.

Prompted by the promotion of three white employees to carmen in late February of 1973, appellee Jackson wrote a letter March 12, 1973, to the Equal Employment Opportunity Commission [EEOC], complaining that he had "been discriminated against ever since 1955 in reference to promotion." On April 6, 1973, Jackson wrote Shop Superintendent O. G. Wood, asking for "favorable consideration to my request that I be promoted to carman," and that same day filed a formal charge with the EEOC, alleging that Seaboard Coast Line Railroad and "BRC of A Local No. 508" had discriminated against him by "upgrading other employees (white) with less experience or seniority."

Jackson timely filed this action in federal district court after receiving a right-to-sue letter from the EEOC. Originally, the suit was brought as a class action under Title VII against the SCL and the Brotherhood, alleging in essence that the promotion pro-

visions contained in the 1967 collective bargaining agreement, as well as in predecessor agreements, have served to perpetuate past employment discrimination against black carman helpers and have continuously discriminated against them by depriving them of advancement to the position of carman. Jackson subsequently amended the original complaint: he deleted the railroad as a primary defendant, dropped the class action allegations, joined as named plaintiffs W. C. McClendon, Lige Scretchen, Nathanial Cooper, and W. E. Parker, who were initially members of the class, and added additional claims for relief under 42 U.S.C. § 1981. After discovery was completed, the appellees and the appellant filed motions for summary judgment, which the district court denied. Following a three day trial, the jury returned a verdict on the § 1981 claims in favor of the Brotherhood.[4] Nine months later, on May 15, 1980, the district court issued its order on the Title VII claims, finding for the appellees.[5]

The court reinstated the railroad as a defendant for the purpose of providing full relief to the appellees and ordered the SCL and the Brotherhood to admit the appellees to the carmen's roster, giving each appellee the seniority date of July 2, 1965, in the order of his hire in relation to the other appellees. The court did not resolve the issue of back pay at that time, however; instead, it encouraged the parties to reach an accord within forty-five days, after which time the appellees could apply for a hearing or ruling on any disputed issue of law or fact. The parties were unable to reach an agreement, and on August 12, 1980 the appellees filed for summary judgment on the issue of back pay, requesting $43,133.14. A month later, on September 23, 1980, having received no response from the Brotherhood to the appellees' motion,[6] the court granted summary judgment for the appellees. The Brotherhood moved to vacate the back pay award under Rule 60(b), Fed.R.Civ.P. The district court denied the motion. These appeals followed.

## II. *Title VII Jurisdiction*

Before instituting a Title VII suit in federal district court, a private plaintiff must file an EEOC complaint against the discriminating party within 180 days of the alleged discrimination and must receive statutory notice of the right to sue the respondent named in the charge.[7] *Alexan-*

---

4. On September 9, 1979, the appellees moved that the court set aside the jury verdict and grant a new trial on the ground that the court erred in not instructing the jury that each appellee had conclusively shown that he was qualified for the carman position. They contended that the sole issue for the jury was whether the defendant had purposely denied the appellees promotion. The district court denied the motion.

5. On August 4, 1980, the Brotherhood filed a motion to vacate the order of May 15, 1980 and dismiss the action, arguing 1) that the court lacked subject matter jurisdiction over the Title VII claims, 2) that the appellees failed to show that the discrimination did not result from a bona fide seniority system protected from attack under § 703(h) of the Civil Rights Act of 1964, and 3) that the court should not have held for the appellees on the Title VII claims in light of the jury's verdict for appellant on the § 1981 actions. All three claims were first raised by the appellant at this time. The district court denied the motion.

6. The Brotherhood, on August 21, 1980, sent a personal letter to the district court requesting a two-week extension of time in which to re-spond to appellees' motion for summary judgment. On August 26, 1980, the Brotherhood sent another personal letter requesting permission to defer the preparation of a reply on the back pay issue until after the court had ruled on appellant's motion to vacate the judgment. At no time did the Brotherhood file a motion for an extension of time to respond or inquire into the court's disposition of its requests. The court did not consider these informal requests to be proper motions for an extension of time in which to respond to the appellees' motion for summary judgment.

7. The conditions precedent to a Title VII action are generally found in 42 U.S.C. § 2000e–5. Here, we are primarily concerned with the conditions precedent set forth in 42 U.S.C. § 2000e–5(e) and § 2000e–5(f)(1). Section 2000e–5(e) provides:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter,

*der v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *Nilsen v. City of Moss Point, Mississippi,* 621 F.2d 117 (5th Cir. 1980); *Crawford v. Western Electric Co.,* 614 F.2d 1300 (5th Cir. 1980); *Cutliff v. Greyhound Lines, Inc.,* 558 F.2d 803 (5th Cir. 1977).[8] Appellant claims that appellees failed to satisfy these requirements and that their Title VII claims must therefore be dismissed for want of subject matter jurisdiction. More specifically, appellant argues that 1) the Brotherhood was never named as a respondent in the EEOC charge filed by Jackson or in the right-to-sue letter received by the appellees; 2) the appellees failed to demonstrate at trial that Jackson filed his EEOC charge within 180 days after an act of discrimination committed by the Brotherhood; and 3) the EEOC charge filed by Jackson cannot be used by the non-filing plaintiffs to pursue their Title VII claims against the Brotherhood. For the following reasons we reject these contentions and find that the district court properly exercised jurisdiction over the Title VII claims against the appellant.

**A. Conditions Precedent or Jurisdictional Prerequisites?**

Appellant did not assert that appellees' Title VII claim should be dismissed on the grounds that appellant was not named as a respondent in the EEOC charge and that the EEOC charge was not filed within 180 days of an alleged discriminatory act until after trial in its motion to vacate the judgment and dismiss the action for lack of subject matter jurisdiction. If the conditions precedent to a Title VII action constitute jurisdictional prerequisites, then the appellant could properly raise these contentions after trial pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure.[9] The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case[10] and cannot be waived or otherwise conferred upon the court by the parties. *E.g., People's Bank v. Calhoun,* 102 U.S. 256, 260–61, 26 L.Ed. 101 (1880). Otherwise, a party could "work a wrongful extension of federal jurisdiction and give district courts power the Congress denied them." *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 18, 71

except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency. Section 2000e-5(f)(1) provides in pertinent part:

If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice.

8. The Eleventh Circuit in *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc) adopted as precedent the decisions of the former Fifth Circuit.

9. Fed.R.Civ.P. 12(h)(3) states:

[W]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

10. *See, e.g., Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); *Williamson v. Tucker,* 632 F.2d 579 (5th Cir. 1980); *Mobil Oil Corp. v. Kelley,* 493 F.2d 784 (5th Cir. 1974).

S.Ct. 534, 542, 95 L.Ed. 702 (1950). If, however, the failure to satisfy the preconditions to a Title VII action does not deprive courts of subject matter jurisdiction, then the appellant waived its right to assert appellees' nonfulfillment of conditions precedent by failing to raise that issue in a timely manner. The courts in recent years have struggled with the question whether or not the conditions precedent to a Title VII action are jurisdictional. After carefully considering the statutory language, legislative history, and case law, we conclude that Congress did not intend Title VII's procedural requirements to be jurisdictional prerequisites, which if not satisfied deprive federal courts of subject matter jurisdiction.[11]

■ A court's function in interpreting a statute "is to construe the language so as to give effect to the intent of Congress," and the most persuasive evidence of Congressional intent is the wording of the statute. *United States v. American Trucking Ass'n*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1939). *See Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977). 42 U.S.C. § 2000e–5(f)(3), the statutory provision conferring jurisdiction over Title VII suits to federal district courts, provides that "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions under this subchapter." This provision *unconditionally* confers jurisdiction over claims arising under Title VII to federal district courts. Nothing in

the express language of section 2000e–5(f)(3) suggests that the subject matter jurisdiction of the federal courts is conditioned upon the fulfillment of other procedural requirements for pursuing a Title VII claim. *See Zipes v. Trans World Airlines, Inc.*, — U.S. —, —, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584 (5th Cir. 1981) (en banc). Nor do any of the provisions that detail the prerequisites to filing a Title VII action contain language qualifying section 2000e–5(f)(3). *See, e.g.*, note 7 *supra*. We cannot conclude that Congress' omission of such qualifying language was inadvertent. The preconditions to filing a Title VII action and the jurisdictional provision are found in the same subsection of Title VII, 42 U.S.C. § 2000e–5, and if Congress had wanted to limit the jurisdiction of federal district courts over Title VII claims brought under section 2000e–5(f)(3), it certainly knew how to do it. In conferring jurisdiction on federal district courts over "pattern or practice" suits instituted by the Attorney General under Title VII, Congress specifically limited federal court jurisdiction to "proceedings instituted pursuant to this section . . . ." 42 U.S.C. § 2000e–6(b).[12] But Congress chose not to limit the jurisdiction of federal courts over suits brought by private parties, the EEOC, or the Attorney General under section 2000e–5 in this manner; instead Congress conferred jurisdiction on federal district courts over "actions brought under this title [Title VII]," without special refer-

---

**11.** Federal Courts inferior to the Supreme Court are courts of limited jurisdiction and are empowered to hear only those cases that fall within the judicial power of the United States as defined by Art. III, § 2 of the Constitution and have been specially entrusted to them by Congress pursuant to Art. III, § 1 of the Constitution. "The Congressional power to ordain and establish inferior courts includes the power 'of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.' " *Lockerty v. Phillips*, 319 U.S. 182, 187, 63 S.Ct. 1019, 1022, 87 L.Ed. 1339 (1943) (*citing Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845)). Subject matter jurisdiction therefore comprises both a

constitutional and a statutory component. Here the only issue is whether Congress intended the conditions precedent to a Title VII suit to limit the jurisdiction of federal courts over actions brought under 42 U.S.C. § 2000e–5(f)(3).

**12.** 42 U.S.C. § 2000e–6(b) states, in pertinent part:

The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case.

ence to § 2000e–5 and its procedural requirements. *See* Equal Employment Opportunity Act, Pub.L. No. 92–261, 86 Stat. 103, § 706(f)(3) (codified at 42 U.S.C. § 2000e–5(f)(3) (1976)). Thus, the plain language of the statute indicates that Congress did not intend the conditions precedent to a Title VII action to constitute jurisdictional prerequisites.

Nor does the legislative history of Title VII suggest that Congress intended the statute to be read otherwise. Congress never specifically addressed this issue and never mentioned the interplay between procedural requirements for filing suit and

**13.** *Compare* § 706(d), (e) of the Civil Rights Act of 1964 *with* § 706(e), (f)(1) of the Civil Rights Act of 1964, *as amended* by the Equal Employment Opportunity Act of 1972 (codified at 42 U.S.C. § 2000e–5(e), (f)(1)(1976)).

**14.** Congress decided not to give the EEOC the power to hold hearings and issue cease and desist orders. Instead, it amended the statute by permitting the EEOC and the Attorney General to bring civil actions under certain circumstances and by altering the conditions precedent private plaintiffs must satisfy, leaving the enforcement of Title VII exclusively to the federal courts. 42 U.S.C. §§ 2000e–5(f)(1), (3). The amendment was adopted in order to remedy the shortcomings of Title VII as enacted in 1964. By 1972, it was evident to Congress that employment discrimination would not be eliminated through the procedures established in the Civil Rights Act of 1964. This concern is evidenced by the House Report on H.R. 1746, which states that when the Civil Rights Act was enacted in 1964,

> [i]t was thought that a scheme which stressed conciliation rather than compulsary process would be more appropriate for the resolution of this essentially "human" problem. Litigation, it was thought, would be necessary only on an occasional basis in the event of determined recalcitrance. Experience, however, has shown this to be an oversimplified expectation, incorrect in its conclusions.
>
> \* \* \* \* \* \*
>
> As we have already noted, the Commission has been able to achieve successful conciliation in less than half of the cases in which reasonable cause was determined. It has been the emphasis on voluntariness that has proven to be most detrimental to the successful operation of Title VII. In cases posing the most profound consequences, respondents have more often than not shrugged off the Commission's entreaties and relied upon the unlikelihood of the parties suing them.

federal court jurisdiction, even though in 1972 Congress amended several of the conditions precedent [13] and vigorously debated whether or not to alter Title VII's enforcement scheme by giving the EEOC authority to hold hearings and issue cease and desist orders, restricting the jurisdiction of federal district courts.[14] If the legislative history of the conditions precedent and jurisdictional provision provides any insight into this question, it suggests that Congress did not intend the conditions precedent to limit the jurisdiction of the federal courts. The legislative history indicates that Congress considered Title VII's preconditions to be anal-

H.R.Rep.No.92–238, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 2137, 2144. To remedy this shortcoming, the House Committee on Education and Labor proposed that the EEOC be authorized to hold hearings and issue cease and desist orders because 1) "[a]dministrative tribunals are better suited to rapid resolution of such complex issues than are the courts"; 2) "[e]fficiency and predictability will be enhanced if the necessarily detailed case by case findings of fact and fashioning of remedy is performed by experts in the subject matter"; and 3) "administrative tribunals are less subject to technical rules governing such matters as pleadings and motion practice—which afford opportunities for dilatory tactics—and are less constrained by formal rules of evidence—which give rise to a lengthier (and more costly) process of proof." *Id.* at 2146–47. The minority report on the House bill also proposed that Title VII's enforcement provisions be strengthened in order more swiftly and efficiently to eliminate employment discrimination. However, the minority believed that in light of the EEOC's caseload and backlog, relief from employment discrimination more quickly could be achieved in the courts than through administrative channels. The minority was also concerned about the EEOC serving the multiple roles of investigator, judge, jury and prosecutor. *Id.* at 2167–76. Although advocating different solutions, both sides sought to amend Title VII to facilitate the eradication of employment discrimination. The views of the majority and minority were echoed in the Senate. Our interpretation of § 2000e–5(f)(3) as providing federal district courts with unqualified subject matter jurisdiction over Title VII claims is consistent with Congress' goal of eliminating employment discrimination because it permits the courts to equitably modify the conditions precedent where necessary to effectuate the purposes of Title VII.

ogous to procedural requirements, which do not limit the jurisdiction of federal courts in other contexts. For example, Congress considered Title VII's filing periods to operate as statutes of limitations. Final Conference Committee section-by-section analysis of H.R. 1745, The Equal Employment Opportunity Act of 1972, 118 Cong.Rec. 7166, 7177; 110 Cong.Rec. 7243 (remarks of Sen. Case); 110 Cong.Rec. 12712 (remarks of Sen. Humphrey). *See Zipes v. Trans World Airlines, Inc., supra,* —— U.S. at ——, 102 S.Ct. at 1132; *Coke v. General Adjustment Bureau, Inc., supra* at 593–94 & n. 18. The failure to satisfy statutes of limitations, conditions precedent, *in personam* jurisdiction, and other procedural requirements

similar to Title VII's preconditions does not deprive federal courts of subject matter jurisdiction over actions brought under jurisdictional provisions similar to § 2000e–5(f)(3).[15] Thus, although Congress never expressly addressed this issue, we find some support in the legislative history for our reading of Title VII as providing federal district courts with subject matter jurisdiction over claims brought under § 2000e–5(f)(3), unqualified by the procedural requirements found in other subsections of section 2000e–5.

The case law also supports our conclusion that the conditions precedent to filing a Title VII suit are not jurisdictional prerequisites.[16] Neither the Supreme Court nor

**15.** Compare, e.g., 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States") *with* 42 U.S.C. § 2000e–5(f)(3) ("Each United States district court ... shall have jurisdiction of actions under this subchapter."). It is beyond dispute that statutes of limitations, conditions precedent, *in personam* jurisdiction, and other procedural requirements do not limit federal court jurisdiction under 28 U.S.C. § 1331.

**16.** The Supreme Court and the former Fifth Circuit have in some cases loosely referred to the conditions precedent to a Title VII action as "jurisdictional prerequisites." *See, e.g., Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *McArthur v. Southern Airways, Inc.,* 569 F.2d 276, 277 (5th Cir. 1978) (en banc); *Beverly v. Lone Star Lead Construction Corp.,* 437 F.2d 1136, 1139 (5th Cir. 1971). However, the trend of the Supreme Court has been away from using that label. *E.g., Zipes v. Trans World Airlines, Inc., supra* —— U.S. at —— & n.12, 102 S.Ct. at 1133 & n.12; *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Mohasco Corp. v. Silver,* 447 U.S. 807, 818–23, 100 S.Ct. 2486, 2492–95, 65 L.Ed.2d 532 (1980); *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976); *Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). *See Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 588–89 (5th Cir. 1981) (en banc). In *Zipes v. Trans World Airlines, Inc., supra* —— U.S. at ——, 102 S.Ct. at 1132, the Supreme Court observed that "[a]lthough our cases contain scattered references to the timely filing as jurisdictional, the legal character of the requirement was not at issue in those cases, and as

more often in the same or other cases, we have referred to the provision as a limitations statute." Moreover, the Supreme Court's treatment of other conditions precedent is clearly inconsistent with the use of the label "jurisdictional prerequisites." *See* text *infra.* Similarly, the former Fifth Circuit has in many cases characterized Title VII's procedural requirements as "conditions precedent" rather than "jurisdictional prerequisites." *E.g., Sessions v. Rusk State Hospital,* 648 F.2d 1066 (5th Cir. 1981); *Coke v. General Adjustment Bureau, Inc., supra; EEOC v. Klingler Electric Corp.,* 636 F.2d 104, 106 (5th Cir. 1981); *Chappell v. Emco Machine Works Co.,* 601 F.2d 1295 (5th Cir. 1979); *Page v. U. S. Industries, Inc.,* 556 F.2d 346, 350–51 (5th Cir. 1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *EEOC v. Standard Forge and Axle Company, Inc.,* 496 F.2d 1392 (5th Cir. 1974), *cert. denied,* 419 U.S. 1106, 95 S.Ct. 776, 42 L.Ed.2d 801 (1975); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). More significantly, as discussed in the text, each time the court has actually considered whether or not a particular condition precedent is jurisdictional, the court has concluded that the precondition is not a jurisdictional prerequisite. *E.g., Sessions v. Rusk State Hospital, supra* (90 day limitation for filing a Title VII action is not a jurisdictional requirement); *Coke v. General Adjustment Bureau, Inc., supra* (180 day limitation for filing an EEOC complaint is not a jurisdictional requirement); *Miller v. International Paper Co.,* 408 F.2d 283 (5th Cir. 1969) (filing of an EEOC complaint is a procedural rather than a substantive requirement). In addition, the former Fifth Circuit's treatment of Title VII's conditions precedent is inconsistent with characterizing them as jurisdictional. *See* text *infra.*

this court has expressly decided that none of the conditions precedent are jurisdictional; however, both courts have held that particular conditions precedent are not jurisdictional, *e.g., Zipes v. Trans World Airlines, Inc., supra; Sessions v. Rusk State Hospital,* 648 F.2d 1066 (5th Cir. 1981), and have interpreted and applied other conditions precedent in a manner that is inconsistent with their being jurisdictional.[17]

For example, in *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court considered whether Title VII relief is available to members of a class action who not only failed to satisfy such conditions precedent as the timely filing of an EEOC complaint within 180 days of the alleged discrimination, timely filing of a Title VII action within 90 days after receiving a right to sue letter, or naming of a defendant as a respondent in the EEOC charge, but who did not file an EEOC complaint at all. Relying on the decisions of the courts of appeals and the legislative history of the Equal Employment Opportunity Act of 1972, the Court concluded that relief under Title VII "may be awarded on a class basis ... without exhaustion of administrative procedures by the unnamed class members." *Id.* at 414 n.8. *See United Air Lines, Inc. v. Mc-Donald,* 432 U.S. 385, 389 n.6, 97 S.Ct. 2464, 2468, 53 L.Ed.2d 423 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976). The Court's treatment of class members who failed to satisfy Title VII's filing requirement stands in stark contrast to its treatment of class members who failed to fulfill the $10,000 jurisdictional amount requirement of 28 U.S.C. § 1331.[18] In the latter instance, the Court has barred participation in a class action by potential class members not satisfying the $10,000 requirement. *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). "If the timely filing of an administrative claim is truly a jurisdictional prerequisite, then each class member should be required to file a

**17.** In determining whether a condition precedent has been satisfied neither the Supreme Court nor the former Fifth Circuit have required that the conditions precedent to a Title VII action literally be met so long as the purposes of the preconditions have been satisfied. "Mindful of the remedial and humanitarian underpinnings of Title VII and of the crucial role played by the private litigant in the statutory scheme, courts construing Title VII have been extremely reluctant to allow procedural technicalities to bar claims under the Act." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). *See Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972) ("Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process."). Both courts have on occasion modified the conditions precedent in light of equitable considerations. *E.g., Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) (refusal to dismiss suit on the grounds that the plaintiff did not bring action within 90 days after receiving right-to-sue letter because defendant did not assert the tardy filing as a defense); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Title VII relief available to members of class action who never filed complaints with the EEOC); *Sessions v. Rusk State Hospital,* 648 F.2d 1066 (5th Cir. 1981) (90 day limitation period for filing a Title VII action is not a jurisdictional prerequisite and is subject to equitable tolling); *Crawford v. United States Steel Corp.,* 660 F.2d 663 (5th Cir. 1981) (permitting relief to similarly situated, non-filing plaintiffs in a non-class action); *Chappell v. Emco Machine Works Co.,* 601 F.2d 1295 (5th Cir. 1979) (180 day limitation for filing an EEOC complaint not a jurisdictional prerequisite and is subject to equitable tolling); *White v. Dallas Independent School District,* 581 F.2d 556 (5th Cir. 1978) (en banc) (action not dismissed although plaintiff failed to exhaust state administrative remedies as required under 42 U.S.C. § 2000e–5(c)); *EEOC v. Airguide Corp.,* 539 F.2d 1038 (5th Cir. 1976) (action not dismissed although defendant had not received notice of the EEOC charge within 10 days of its filing as required by U.S.C. § 2000e–(5)(b)). Such relaxation of these requirements is wholly inconsistent with their being considered "jurisdictional prerequisites" since only Congress can modify the requirements that must be satisfied to enable a court to exercise dominion over a claim. *See Chappell v. Emco Machine Works Co., supra* at 1298; *Miller v. International Paper Co.,* 408 F.2d 283, 285 (5th Cir. 1969).

**18.** Congress deleted the $10,000 amount in controversy requirement from 28 U.S.C. § 1331 in 1980.

claim before participating in a Title VII class action, just as each class member must satisfy the jurisdictional amount in other class actions. The fact that they do not is an indication that the Court does not consider the filing requirement to be jurisdictional." *Coke v. General Adjustment Bureau, Inc., supra* at 589. *See Zipes v. Trans World Airlines, Inc., supra* —— U.S. at ——, 102 S.Ct. at 1133; *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295, 1298 (5th Cir. 1979).

Prior to the Supreme Court's holding in *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the former Fifth Circuit in *Miller v. International Paper Co.*, 408 F.2d 283 (5th Cir. 1969) held that non-filing parties can be joined as members of a class in Title VII suits. In so deciding, it rejected the district court's reasoning that since the filing of a charge with the EEOC is a jurisdictional prerequisite, an individual who has not filed charges with the Commission cannot entertain a civil action as a class member. The court explained that "[t]he fallacy of the district court's reasoning is that the matter is primarily *procedural* rather than *substantive* and thus the question is one of simple expediency. In this posture, it is perfectly clear that no procedural purpose could be served by requiring scores of substantially identical grievances to be processed through the EEOC when a single charge would be sufficient to effectuate both the letter and the spirit of Title VII." *Id.* at 285 (emphasis added). Extending this rationale to non-filing plaintiffs in a multiple-plaintiff, non-class action, the court in *Crawford v. United States Steel Corp.*, 660 F.2d 663 (5th Cir. 1981) held that "in an action involving claims of several persons arising out of similar discriminatory treatment, not all of them need to have filed EEOC charges as long as one or more of the plaintiffs had satisfied the requirement." *Id.* at 665; *Allen v. United States Steel Corp.*, 665 F.2d 689, 695 (5th Cir. 1982); *Wheeler v. Ameri-*

*can Home Products Corp.*, 582 F.2d 891, 897 (5th Cir. 1977); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968).

The clear implication of these decisions is that the filing of an EEOC charge is not a jurisdictional prerequisite. If it were, neither the Supreme Court nor the former Fifth Circuit could have permitted federal district courts to consider claims of non-filing plaintiffs, regardless of how similar the claims of such plaintiffs were to those raised by plaintiffs who had fulfilled the jurisdictional requirements. Only Congress—not the judiciary—can modify those requirements that must be satisfied to enable lower federal courts to exercise dominion over a cause of action. *See Emco Machine Works Co., supra* at 1298; *Miller v. International Paper Co., supra* at 285. If a party's failure to file an EEOC charge and consequently receive a right-to-sue letter does not deprive the courts of subject matter jurisdiction, then certainly the technicalities of filing an EEOC charge or a Title VII suit cannot constitute jurisdictional prerequisites.

The Supreme Court's treatment of Title VII's time limitations for filing an EEOC charge, 42 U.S.C. § 2000e–5(e) and for bringing a civil action, 42 U.S.C. § 2000e–5(f)(1), confirms our conclusion. In *Zipes v. Trans World Airlines, Inc., supra*, the Court expressly addressed for the first time whether or not a condition precedent to a Title VII action constitutes a jurisdictional prerequisite. The issue before the Court was whether the requirement that an EEOC charge be timely filed, 42 U.S.C. § 2000e–5(e), is a jurisdictional prerequisite, which if not satisfied deprives federal district courts of subject matter jurisdiction over Title VII claims, or whether the requirement is more akin to a statute of limitations, which is not jurisdictional and thus may be subject to equitable modification.[19]

---

**19.** Suit was first brought in 1970 by the Air Line Stewards and Stewardesses Association (ALSSA), the then collective bargaining agent of Trans World Airlines flight attendants, as a class action alleging that TWA practiced unlawful sex discrimination in violation of Title VII by its policy of grounding all female flight attendants who became mothers, while their

In a well-reasoned opinion, the Court held "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc., supra,* —— U.S. at ——, 102 S.Ct. at 1132. First, the Court observed that the provision granting jurisdiction to district courts, section 2000e–5(f)(3), "does not limit jurisdiction to those cases in which there has been a timely filing with the EEOC," and that "[t]he provision specifying the time for filing charges with the EEOC appears as an entirely separate provision, and it does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id.* Second, the Court noted that the legislative history was sparse but that it indicated that Congress intended the filing limitation to operate like a statute of limitations rather than a jurisdiction-

al prerequisite. *Id.* Third, the Court found that prior case law was inconsistent with treating the filing requirement as limiting the jurisdiction of the district court. It noted that to hold the filing requirement to be a jurisdictional prerequisite would be inconsistent with *Albermarle Paper Co. v. Moody, supra,* and *Franks v. Bowman Transportation Co., supra,* which, as discussed above, held that relief under Title VII may be awarded to class members who have not exhausted administrative remedies before the EEOC, and with the reasoning of other Supreme Court decisions, which treated the filing requirement as non-jurisdictional without expressly so holding. *Id.* —— U.S. at ——, 102 S.Ct. at 1133. *See Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976).[20] And,

male counterparts who became fathers were allowed to continue flying. The parties reached a settlement, which was approved by the district court; however, on appeal from the settlement, the Seventh Circuit found the union to be an inadequate class representative and remanded the case with instructions that the district court name individual class members to replace the union as class representatives. *Air Line Stewards and Stewardesses Assn. v. American Airlines, Inc.,* 490 F.2d 636 (7th Cir. 1973). On remand, the district court granted TWA's motion to amend its answer to assert that certain plaintiffs' claims were barred because the plaintiffs had failed to file charges with the EEOC within the statutory time limit. In granting the motion, the district court observed that the "delay in pleading the defense of limitations may well ultimately constitute a waiver of the defense." In ruling on TWA's motion to exclude class members, however, the district court agreed with TWA that the filing requirement is a jurisdictional prerequisite not subject to waiver. Nevertheless, it denied the motion to exclude class members, finding that *because the airline's violation was continuous,* the EEOC charge was timely filed for the entire class. The Court of Appeals disagreed. It refused to extend the continuing violation theory to include those class members who were terminated more than 90 days before the filing of EEOC charges and found that because the timely filing of an EEOC charge is a jurisdictional prerequisite, approximately 92% of the plaintiffs' claims were jurisdictionally barred. The Supreme Court reversed.

20. In *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1979), the Supreme Court addressed whether the 180 day period for filing an EEOC charge, 42 U.S.C. § 2000e–5(e), is tolled during the pendency of a grievance procedure pursued in accordance with a collective bargaining agreement. The Court concluded that the filing period does not toll in such circumstances, rejecting each of the petitioner's five tolling arguments "not on the basis that the 180 day period was jurisdictional, but after consideration of the merits of whether or not the pursuit of grievance procedures should toll the running of the limitations period." *Coke v. General Adjustment Bureau, Inc., supra* at 587. In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court again characterized the 180 day filing period as a limitations period. At issue in that case was whether the respondent, a college professor, filed a timely complaint with the EEOC alleging that he had been denied academic tenure because of his national origin. Responding to the argument that the filing period was tolled during the pendency of respondent's grievance, the Court stated: "[W]e already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods. *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976). The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that

finally, the Court reasoned that "[b]y holding compliance with the filing period to be not a jurisdictional prerequisite to filing a Title VII suit, but a requirement subject to waiver as well as tolling when equity so requires, we honor the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Id.* —— U.S. at ——, 102 S.Ct. at 1133.

In *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), the Supreme Court also made clear that the requirement that a party file a Title VII action within 90 days after receiving a right-to-sue letter, 42 U.S.C. § 2000e–5(f)(1), is not a jurisdictional prerequisite. Before reaching the merits, the Court noted that the action had not been timely filed. But rather than dismissing the action *sua sponte* as it would have done had it considered the requirement a jurisdictional prerequisite, the Court considered the case properly before it because the "[p]etitioner did not assert respondent's failure to file the action within 90 days as a defense." *Id.* at 811 n.9, 100 S.Ct. at 2489 n.9. In so doing, the Court held by implication that Title VII's 90 day filing requirement is not a jurisdictional prerequisite. *See Zipes v. Trans World Airlines, Inc., supra* —— U.S. at ——, 102 S.Ct. at 1133.

The former Fifth Circuit also has concluded that Title VII's filing periods are not jurisdictional. In *Chappell v. Emco Machine Works Co., supra,* the court addressed whether the 180 day limitation for filing an EEOC complaint, 42 U.S.C. § 2000e–5(e), is subject to equitable delay or interruption. *See also Reeb v. Economic Opportunity Atlanta, Inc.,* 516 F.2d 924 (5th Cir. 1975). Confronted with prior decisions of the Fifth Circuit and the Supreme Court that loosely referred to the timely filing of an EEOC complaint as a "jurisdictional prerequisite," the court acknowledged that "[i]t is illogical to designate a particular fact as necessary

to the court's jurisdiction, yet, in its absence, allow the court to adjudicate whether equities indicate that the jurisdictional defect should be ignored." *Id.* at 1298. After carefully analyzing the relevant precedent, the court concluded that even though some holdings characterized the filing period as jurisdictional, they "do not preclude equitable modification of its requirements." *Id.* at 1302. In *Coke v. General Adjustment Bureau, Inc., supra,* the former Fifth Circuit, en banc, reaffirmed its holding in *Chappell* and made clear that while the 180 day filing requirement under Title VII is a condition precedent to filing suit in district court, it is not related to the court's subject matter jurisdiction. *Id.* at 587–95. *See Allen v. United States Steel Corp.,* 665 F.2d 689, 695 n.2 (5th Cir. 1982). Similarly, in *Sessions v. Rusk State Hospital,* 648 F.2d 1066 (5th Cir. 1981), the court held that the 90 day limitation for filing a Title VII suit is not a jurisdictional prerequisite. "After the right-to-sue letter is issued, the timeliness of the suit in federal court does not involve the court's jurisdiction but whether the litigant has fulfilled the statutory conditions." *Id.* at 1070. *See Whatley v. Department of Education,* 673 F.2d 873, 879 n.5 (5th Cir. 1982). *See also Page v. U. S. Industries, Inc.,* 556 F.2d 346, 350–51 (5th Cir. 1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978); *Zambuto v. American Telephone & Telegraph Co.,* 544 F.2d 1333 (5th Cir. 1977). Thus, both the Supreme Court and former Fifth Circuit have concluded that Title VII's time limitations are not jurisdictional prerequisites.

The former Fifth Circuit has also treated other Title VII conditions precedent in a manner inconsistent with their being jurisdictional. In *White v. Dallas Independent School District,* 581 F.2d 556 (5th Cir. 1978) (en banc), the court considered whether the district court properly dismissed the appellant's Title VII suit for want of subject matter jurisdiction because the plaintiff failed to pursue her claim of employment

limitations periods normally commence when the employer's decision is made." *Id.* at 261,

101 S.Ct. at 505 (footnotes omitted).

discrimination in an appropriate state agency before filing a charge with the EEOC as required by 42 U.S.C. § 2000e–5(c).[21] Although the court found that the Texas statute in question was sufficient to trigger the requirements of 42 U.S.C. § 2000e–5(c), it nevertheless held that the district court erred in dismissing the suit because the EEOC substantially misled the plaintiff and "their mistakes should not redound to her detriment." *Id.* at 562. As the court later noted in *Coke v. General Adjustment Bureau, Inc., supra,* "[a]lthough we expressly declined to decide whether the provision was a 'jurisdictional prerequisite,' we necessarily held that the equitable consideration of the misleading EEOC letters excused Mrs. White's failure to file with the state agency." *Id.* at 592. *See Chappell v. Emco Machine Works Co., supra* at 1300.[22] The court could not have excused the plaintiff from filing a complaint with the appropriate state agency if the satisfaction of the precondition was necessary to the court's jurisdiction. In *EEOC v. Airguide Corp.,* 539 F.2d 1038 (5th Cir. 1976), the court

again interpreted a specific precondition to filing a Title VII suit in light of equitable considerations. The issue there was whether the district court properly granted summary judgment for the defendants on the ground that the EEOC failed to comply with 42 U.S.C. § 2000e–5(b), which requires the Commission to serve notice of a charge to the alleged violator within ten days after the charge is filed.[23] After an evidentiary hearing, the district court concluded that the notice of the charge was mailed within the ten day period but that it was not received by the defendant until nine months after the charge was filed. Nevertheless, the former Fifth Circuit was "unwilling to hold that in the present situation—where there has been virtual compliance with all the statutory procedural steps, and where there has been no clear showing of substantial prejudice to Airguide—there has been a showing of a denial of due process sufficient to bar EEOC from bringing suit." *Id.* at 1042. Accordingly, the court reversed and remanded the cause to the district court for a determination of the prejudice

**21.** 42 U.S.C. § 2000e–5(c) provides:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

**22.** Other circuits have held that deferral to a state agency pursuant to 42 U.S.C. § 2000e–5(c) is not jurisdictional in the sense that the

failure to satisfy the requirement deprives federal courts of the power to act. *See, e.g., EEOC v. Wah Chang Albany Corp.,* 499 F.2d 187 (9th Cir. 1974); *Mitchell v. Mid-Continent Spring Company of Kentucky,* 466 F.2d 24 (6th Cir.), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d 589 (1973); *Vigil v. American Telephone & Telegraph Co.,* 455 F.2d 1222 (10th Cir. 1972).

**23.** 42 U.S.C. § 2000e–5(b) states in pertinent part:

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof.

suffered by defendant Airguide because of the lack of timely notice of the charge. Again, the court in *EEOC v. Airguide Corp., supra,* could not have equitably modified the condition precedent if the failure to satisfy the precondition deprived the court of subject matter jurisdiction.

Finally, a line of former Fifth Circuit cases explicitly treats the preconditions to filing a Title VII action as conditions precedent under Fed.R.Civ.P. 9(c). *EEOC v. Klingler Electric Corp.,* 636 F.2d 104, 106 (5th Cir. 1981); *EEOC v. The Times-Picayune Publishing Corp.,* 500 F.2d 392 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975); *EEOC v. Standard Forge and Axle Co.,* 496 F.2d 1392 (5th Cir. 1974), *cert. denied,* 419 U.S. 1106, 95 S.Ct. 776, 42 L.Ed.2d 801 (1975). Rule 9(c) provides that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance shall be made specifically and with particularity." Under this rule, if a party disagrees with a general averment that the conditions precedent have been met, that party may raise the issue with a specific and particular denial. If the party does not deny the satisfaction of the conditions precedent specifically and with partic-

ularity, however, the allegations are assumed admitted and cannot later be attacked. *EEOC v. Klingler Electric Corp., supra* at 107; *EEOC v. Standard Forge and Axle Co., supra* at 1395; *Ginsburg v. Insurance Co. of North America,* 427 F.2d 1318 (6th Cir. 1970). The court's treatment of Title VII's procedural requirements as conditions precedent under Rule 9(c) is wholly inconsistent with their being jurisdictional prerequisites because the satisfaction of a jurisdictional requirement cannot be waived and may be joined in issue by the parties or raised by the court at any time during the judicial proceedings.

In conclusion, the decisions of both the Supreme Court and former Fifth Circuit reaffirm our interpretation of the language of Title VII and its legislative history. Both courts expressly have held that particular conditions precedent to a Title VII action are not jurisdictional prerequisites and have treated other preconditions in a manner inconsistent with their being jurisdictional. Although the courts have not had occasion to address the nature of each of Title VII's preconditions, we discern no rational basis for treating those that have not been considered from those that implicitly or explicitly have been held not to be jurisdictional.[24] Therefore, we hold that

---

**24.** The Brotherhood contends that the district court lacked subject matter jurisdiction over plaintiffs' Title VII claims because it was not named as a respondent in the EEOC complaint filed by plaintiff Jackson. That condition precedent previously has not been considered in a context requiring the courts to address explicitly or implicitly whether or not the requirement is a jurisdictional prerequisite. For several reasons, we cannot distinguish this condition precedent from those which have been found not to be jurisdictional. First, the naming requirement is found in 42 U.S.C. § 2000e–5(f)(1), which provides in pertinent part that "within ninety days after giving of such notice a civil action may be brought against the person named in the charge (A) by the person claiming to be aggrieved . . . ." As previously discussed, nothing in the language of the provision or the legislative history indicates that it was intended to modify district court jurisdiction under § 2000e–5(f)(3). Moreover, both the Supreme Court and the former Fifth Circuit have held that the 90 day limitation for filing a Title VII action is not a jurisdictional prerequi-

site. *Mohasco Corp. v. Silver, supra; Sessions v. Rusk State Hospital, supra.* We find no logical basis for treating the first part of the filing requirement, which requires that suit be filed within 90 days, differently than the second part, which provides that suit may be instituted against the person named as a respondent in the charge. In addition, the former Fifth Circuit in *Terrell v. United States Pipe & Foundry Co.,* 644 F.2d 1112 (5th Cir. 1981) liberally interpreted the naming requirement so as to permit plaintiffs to bring Title VII claims against not only those parties specifically named as respondents in the EEOC charges, but also parties "sufficiently implicated in the discrimination alleged in appellants' original charges to have reasonably triggered an EEOC investigation of the [party]." *Id.* at 1124. *See Glus v. G. C. Murphy Co.,* 562 F.2d 880 (3d Cir. 1977); *Tillman v. City of Boaz,* 548 F.2d 592 (5th Cir. 1977); *Kaplan v. International Alliance of Theatrical and Stage Employees,* 525 F.2d 1354 (9th Cir. 1975). In applying this standard, the court looked beyond the express

the conditions precedent to a Title VII action are not jurisdictional prerequisites, which if not satisfied deprive federal district courts of subject matter jurisdiction.

██ Our holding does not mean that plaintiffs no longer must prove that they have satisfied the conditions precedent to a Title VII action. *See EEOC v. Klingler Electric Corp., supra* at 107; *Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803, 806 (5th Cir. 1977). To the contrary, a plaintiff must generally allege in his complaint that "all conditions precedent to the institution of the lawsuit have been fulfilled." Fed.R. Civ.P. 9(c). If the defendant doubts the veracity of the plaintiff's allegation, in whole or in part, then the defendant may deny "specifically and with particularity" that the preconditions have not been fulfilled. *Id.* The plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied. *See EEOC v. Klingler Electric Corp., supra* at 106; *EEOC v. The Times-Picayune Publishing Corp., supra; EEOC v. Standard Forge and Axle Company, Inc., supra* at 1395. *Cf. Cutliff v. Greyhound Lines, Inc., supra* at 806. If, however, the defendant does not deny the satisfaction of the preconditions specifically and with particularity, then the plaintiff's allegations are assumed admitted, and the defendant cannot later assert that a condition precedent has not been met. *See EEOC v. Standard Forge and Axle Company, Inc., supra* at 1395; *Ginsburg v. Insurance Co. of North America*, 427 F.2d 1318, 1322 (6th Cir. 1970).

**B. The EEOC Complaint: The Naming of The Brotherhood and the Timely Filing of the Complaint.**

Appellant contends that the district court lacked jurisdiction over appellees' Title VII claims because it was not properly named as a respondent in the EEOC charge filed by Jackson and therefore did not receive notice of the charge. 42 U.S.C. § 2000e–5(f)(1). The EEOC complaint filed by Jackson specifically named as respondents the Seaboard Coast Line Railroad and "BRC of A Local No. 508." Appellant argues that the naming of the union local as a respondent does not suffice to confer jurisdiction over Title VII claims brought against the international union. Moreover, the Brotherhood asserts that the district court lacked jurisdiction over the Title VII claims because the EEOC complaint was not filed within 180 days of an alleged discriminatory act. 42 U.S.C. § 2000e–5(e). These claims were first raised by the appellant after trial by motion to vacate the judgment and dismiss the action for lack of subject matter jurisdiction. The district court denied the motion. We affirm.

As discussed above and contrary to appellant's contention, the conditions precedent to a Title VII action are not jurisdictional. A party, therefore, cannot wait until after trial to take issue with the opposing party's general averment that the conditions precedent have been satisfied. On the contrary, a defendant must deny in its answer that a condition precedent has not been fulfilled "specifically and with particularity." Fed. R.Civ.P. 9(c). In this case, the original complaint alleged that the conditions precedent to a Title VII action against the defendants had been satisfied.[25] The Brotherhood an-

---

terms of the EEOC charges and examined the specific discriminatory conduct alleged to see if it implicated the defendants. Thus, the court equitably modified this precondition as it did those that were expressly held not to be jurisdictional. Finally, both the Supreme Court and former Fifth Circuit under certain circumstances have permitted plaintiffs, who have neither filed an EEOC charge nor received a right-to-sue letter, to obtain relief in a Title VII action. *E.g., Albermarle Paper Co. v. Moody, supra; Miller v. International Paper Co., supra; Crawford v. United States Steel Corp., supra.* If the

failure to file an EEOC complaint does not deprive courts of subject matter jurisdiction, then the naming of a defendant as a respondent in an EEOC charge cannot be essential to the courts' subject matter jurisdiction.

**25.** The original complaint stated in pertinent part:

On or about March 12, 1973, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission alleging the continuing failure by defendants, and specifically the failure within the preceding 180 days, to promote plaintiff to a journey-

swered that it was "without knowledge or information sufficient to form a belief as to the truth of the allegations . . . ." [26] This answer suffices as a general denial of the averment but does not constitute a specific and particular denial, which is required by Rule 9(c) to join in issue the appellees' allegations. By waiting until after trial to assert that Jackson's EEOC complaint was not timely filed and did not name the Brotherhood as a respondent, appellant waived its right to raise these claims.

C. Lack of Jurisdiction over Non-Filing Plaintiffs

Appellant also argues that the district court improperly permitted the joinder of appellees McClendon, Scretchen, Cooper, and Parker because they had not filed complaints with the EEOC and could not rely upon Jackson's EEOC complaint to satisfy the jurisdictional prerequisites to a Title VII action. This claim was timely raised by appellant; [27] however, we find it to be without merit.

We begin by reiterating that the failure to satisfy the conditions precedent to a Title VII action does not deprive the court of subject matter jurisdiction. Nevertheless, the timely filing of an EEOC complaint is a precondition to a Title VII action. *Allen v. United States Steel Corp.*, 665 F.2d 689, 695 (former 5th Cir. 1982); *Crawford v. United States Steel Corp.*, 660 F.2d 663, 665 (5th Cir. 1981). "However, in a multiple-plaintiff, non-class action suit, if one plaintiff has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement." *Allen v. United States Steel Corp., supra* at 695. *See Crawford v. United States Steel Corp., supra; Wheeler v. American Home Products Corp.*, 563 F.2d 1233 (5th Cir.), *reprinted*, 582 F.2d 891 (1977). This "single-filing rule" contains two essential requirements, both of which were satisfied in this case. First, at

men's job and therby [sic] allow him to take and complete apprentice training, and otherwise deny him of his rights under Title VII of the Civil Rights Act of 1964. As of the date of the commencement of this action, the EEOC has not investigated plaintiff's claim of discrimination. By letter received on June 1, 1976, the EEOC notified plaintiff that he was entitled to initiate a civil action in the appropriate United States District Court, as provided by Title VII, within 90 days of the receipt of this notice of right to sue. This action is brought within 90 days thereafter, and all jurisdictional prerequisites to the bringing of an action under Title VII of the Civil Rights Act of 1964 have been complied with.

**26.** In its memorandum in opposition to Jackson's motion for leave to file an amended complaint, the Brotherhood opposed, among other things, the addition of claims under 42 U.S.C. § 1981. The Brotherhood argued that such claims should not be added because the court lacked jurisdiction over the suit as originally brought under Title VII. It alleged that the Brotherhood had not been named in the EEOC charge filed by Jackson and stated that "[w]hen the issues are finally joined and discovery is finished BRC plans to file a dispositive motion." The Brotherhood did not raise the issue in its motion for summary judgment, motion to amend its answer, or the pre-trial order. Not until after the trial did the Brotherhood assert this claim. Similarly, the Brotherhood did not claim that Jackson's EEOC com-

plaint had not been timely filed until after the trial. In its answer, the Brotherhood asserted as an affirmative defense that the plaintiff failed to bring "this action within the limits of time prescribed by relevant statutes." This general assertion does not serve as a specific denial of the plaintiffs' averment that the EEOC complaint was filed within 180 days of an alleged discriminatory act, especially since the Brotherhood specifically stated in its answer that it was "without knowledge or information sufficient to form a belief as to the truth" of the plaintiff's specific allegation that the EEOC complaint had been timely filed. Moreover, the Brotherhood did not raise this issue in its motion for summary judgment or the pre-trial order.

**27.** By way of amended complaint, plaintiff Jackson deleted the class action allegations in his original complaint and joined as named plaintiffs W. C. McClendon, Lige Stretchen, Nathanial Cooper, and W. E. Parker, who were members of the class which Jackson originally sought to represent. The Brotherhood first raised the claim that the additional plaintiffs had not filed EEOC complaints against the Brotherhood and could not rely upon Jackson's EEOC complaints in its memorandum in opposition to plaintiff's motion for leave to file amended complaint and reasserted the claim in its motion for summary judgment.

least one plaintiff must have timely filed an EEOC complaint that is not otherwise defective. As the propriety of Jackson's EEOC complaint was not challenged in a timely manner by the Brotherhood, we must consider it to have been timely filed and proper in every other respect. Second, the individual claims of the filing and non-filing plaintiffs must have arisen out of similar discriminatory treatment in the same time frame. The appellees all worked as helpers in the carman department at the Waycross Yard during the same time period and were all allegedly passed over for promotion on account of their race as a result of discriminatory promotion provisions contained in the collective bargaining agreement between the Brotherhood and Seaboard Coast Line Railroad. There is no question that the appellees were "similarly situated" and that the purpose of the filing requirement—to permit the EEOC first to attempt settlement of grievances—would not have been served "by requiring each of the several plaintiffs to file essentially identical charges." *Crawford v. United States Steel Corp., supra* at 666–67 (plaintiffs, who alleged they were given improper seniority dates, passed over on account of their race, and not adequately represented by their union, held similarly situated even though they worked in different departments); *Wheeler v. American Home Products Corp., supra* at 893–97 (intervention of eight non-filing female employees permitted in an action alleging, inter alia, that the union defendants failed to represent the plaintiffs fairly by consenting to the employer's sex

discrimination). Thus, we hold that the district court properly allowed the non-filing appellees to join in this action and pursue their Title VII claims.

### III. *Bona Fide Seniority System*

■ The Brotherhood next claims as error that the district court did not find and the appellees failed to prove that the alleged discrimination did not result from the normal operation of a *bona fide* seniority system protected from attack under § 703(h) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(h) (1976).[28] Again, appellant raised this issue for the first time after trial in its motion to vacate the judgment and dismiss the action. The district court held that the Brotherhood waived its right to advance this claim by failing to plead it as an affirmative defense under Fed.R.Civ.P. 8(c). We agree.

Fed.R.Civ.P. 8(c) requires that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense."[29] The failure to include an affirmative defense in the answer or have it included in the pre-trial order of the district court, which supersedes the pleadings, will normally result in waiver of the defense. *See Chilivis v. S.E.C.*, 673 F.2d 1205, 1208 (11th Cir. 1982); *Funding Systems Leasing Corp. v. Pugh*, 530 F.2d 91, 96 (5th Cir. 1976). This court has not had occasion to address whether the § 703(h) exemption from Title VII of the disparate impact of a bona fide seniority system is an affirmative defense under Fed.R.Civ.P. 8(c). In answering this question, we first observe that

---

**28.** 42 U.S.C. § 2000e–2(h) provides in pertinent part:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

**29.** Fed.R.Civ.P. 8(c) states in full:

In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

several courts have held that the § 703(h) exemption is in the nature of an affirmative defense. *See Myers v. Gilman Paper Co.,* 527 F.Supp. 647, 25 E.P.D. § 31.692 (S.D.Ga.1981); *Griffin v. Copperweld Steel Co.,* 22 E.P.D. § 30,637 (N.D.Ohio 1979); *Swint v. Pullman Standard,* 17 E.P.D. § 8604 (N.D.Ala.1978), *reversed on other grounds,* 624 F.2d 525 (5th Cir. 1980), *reversed,* —— U.S. ——, 102 S.Ct. 1534, 1547, 71 L.Ed.2d 748 (1982). *See also American Tobacco Co. v. Patterson,* —— U.S. ——, ——, 102 S.Ct. 1534, 1547, 71 L.Ed.2d 748 (1982) (Stevens, J., dissenting) ("Section 703(h) provides an affirmative defense for an employer whose administration of a bona fide seniority or merit system has produced consequences that appear to discriminate against a member of a particular race, religion, or sex."). Similarly, the Supreme Court in *County of Washington v. Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), considered other exemptions from Title VII found in the Equal Pay Act, 29 U.S.C. § 206(d), and incorporated by reference into § 703(h) to be affirmative defenses.

Second, we note that the courts have generally treated statutory exemptions from remedial statutes as affirmative defenses. *See, e.g., County of Washington v. Gunther, supra; United States v. First City National Bank of Houston,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967) (statutory exemption from the antitrust laws found in 12 U.S.C. § 1828(c)(5)(B) of the Bank Merger Act is an affirmative defense); *Chilivis v. S.E.C., supra* at 1208 (statutory exemptions from the FOIA are affirmative defenses); *Rachback v. Cogswell,* 547 F.2d 502, 505 (10th Cir. 1976) (statutory exemption from the operation of the Truth in Lending Act must be pled as an affirmative defense); *Wirtz v. C&P Shoe Corp.,* 336 F.2d 21, 26 & n.1 (5th Cir. 1971) (statutory exemption from the Fair Labor Standards Act must be pled as an affirmative defense); *First National Bank of Lincolnwood*

*v. Keller,* 318 F.Supp. 339 (N.D.Ill.1970) (statutory exemption to the 10% lending limit of the National Banking Act is a matter of avoidance or affirmative defense under Rule 8(c)). *Cf. Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (claim of good faith immunity from § 1983 liability is an affirmative defense). Because § 703(h) serves to exempt from Title VII the disparate impact of a bona fide seniority system, *American Tobacco Co. v. Patterson, supra* at ——, 102 S.Ct. at 1540, it falls within this general rule.

Finally, we find that requiring the § 703(h) exemption to be pled as an affirmative defense promotes fairness. It places the burden of pleading on the party who will be benefited by the departure from the normal operation of Title VII, and permits plaintiffs to proceed without the undue burden of having to anticipate a § 703(h) defense by stating in their complaint that the challenged discrimination is not the result of a bona fide seniority system. *Cf. Gomez v. Toledo,* 446 U.S. at 640, 100 S.Ct. at 1924 (finding no reasonable basis for requiring plaintiffs to anticipate a defense of qualified immunity to a § 1983 claim). Such a burden would unreasonably require plaintiffs to speculate whether defendants intend to assert § 703(h) as a defense and could result in unfair surprise at trial. Only by requiring that § 703(h) be pled as an affirmative defense will both parties be able to proceed to trial with certainty as to whether § 703(h) is at issue. For the above reasons, we hold that the § 703(h) exemption for bona fide seniority systems constitutes an affirmative defense under Fed.R. Civ.P. 8(c).[30] Therefore, by waiting until after judgment to seek refuge in § 703(h), appellant has waived this defense.

## IV. *Legal Standards*

Appellant further contends that the district court applied the wrong legal principles in finding it in violation of Title VII. It argues that the appropriate test for de-

---

**30.** Although we hold that § 703(h) exemption for bona fide seniority systems constitutes an affirmative defense for pleading purposes, we do not address in this opinion the proper allo-cation of the burden of proving that the challenged discrimination results from a bona fide seniority system.

termining whether an individual has been discriminatorily denied promotion is the "disparate treatment" analysis enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). While the *McDonnell Douglas* test is indeed a proper method for proving that an individual has unlawfully been denied promotion, the "disparate impact" analysis set forth in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) is also an appropriate method in this case.[31] *See, e.g., Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527 (1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); *Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374 (5th Cir. 1978)*, cert. denied, *441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979). The essential difference between these tests is that in order to establish disparate treatment proof of discriminatory intent is crucial, although it can in some circumstances be inferred from the fact of mere differences in treatment, whereas to succeed under a theory of disparate impact proof of discriminatory motive is not required. As the Supreme Court observed in* International Brotherhood of Teamsters v. United States, *431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) "[e]ither theory may, of course, be applied to a particular set of facts."* Id. at 335 n.15, 97 S.Ct. at 1854 n.15.[32] Here, the

district court found that the Brotherhood violated Title VII under both tests.

A. Disparate Impact Analysis

Title VII proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation. "Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co., supra* at 430, 91 S.Ct. at 853. Therefore, promotion practices that block the advancement of a minority class and that at the very least perpetuate an employer's past discrimination are unlawful under Title VII, absent a showing by the defendant that the practices are justified by business necessity. *See Claiborne v. Illinois Central Railroad*, 583 F.2d 143, 148 (5th Cir. 1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Parson v. Kaiser Aluminum & Chemical Corp., supra* at 1389; *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 244 (5th Cir. 1974), appeal after remand, 576 F.2d 1157 (1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

In *Claiborne v. Illinois Central Railroad, supra*, the former Fifth Circuit applied the *Griggs* test to facts similar to those in the instant case.[33] There, the plaintiffs, 21 car-

---

**31.** The Supreme Court in *American Tobacco Co. v. Patterson*, —— U.S. ——, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) made clear that § 703(h) exempts from Title VII the disparate impact of a bona fide seniority system, regardless of whether the seniority system was adopted before or after the effective date of the Civil Rights Act. This decision does not affect the disposition of this case, however, because even if the promotion practices under attack are components of a bona fide seniority system within the meaning of § 703(h), appellant has waived its § 703(h) defense by failing to properly plead it under Fed.R.Civ.P. 8(c). *See* text *supra* at 1012–1013.

**32.** This does not mean that both theories are always appropriate under a particular set of facts to prove employment discrimination in violation of Title VII. *See, e.g., Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575 & n.7, 98 S.Ct. 2943, 2948 & n.7, 57 L.Ed.2d 957 (1978). In this case, however, the disparate impact test is particularly appropriate because

plaintiffs are attacking a promotion requirement that has served to perpetuate past discrimination and has continuously deprived the plaintiffs of advancement. *See, e.g., Claiborne v. Illinois Central Railroad*, 583 F.2d 143, 148 (5th Cir. 1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Parson v. Kaiser Aluminum & Chemical Corp., supra* at 1389. The disparate treatment test is also an appropriate means of establishing intentional employment discrimination in violation of Title VII.

**33.** The plaintiffs in *Claiborne v. Illinois Central Railroad, supra*, alleged that the railroad administered its hiring and promotional system in a manner that resulted in only whites being classified as carmen. This was accomplished by recruiting only white employees to the apprentice class, while hiring blacks as helpers and laborers. Only apprentices and white workers from other positions in the yard were promoted to carmen. Here, no blacks were

man helpers and 7 laborers, alleged that the Illinois Central Railroad had discriminated against them in the hiring of carmen by administering its recruiting and promotional system in a racially discriminatory manner. The principle issue on appeal was whether the district court had properly calculated damages. Before addressing that issue, however, the court observed that the railroad's liability was properly premised upon the disparate impact of these employment practices. It concluded that the evidence supported the district court's findings that each plaintiff was qualified to work as a carman, none of the plaintiffs was promoted to carman as a result of racial discrimination, and in the absence of discrimination, each plaintiff would have been promoted on the date he was qualified for the position. Based upon these findings, the court held that "[a]lthough neutral on its face, the job classification and promotional system . . ., in which the existence of a predominantly white apprentice class effectively blocked the upgrading of black helpers and laborers, operated at the very least to " 'freeze' the status quo of prior discriminatory employment practices," *Griggs v. Duke Power Co., supra* at 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1974), in violation of Title VII." The court also found that the

railroad "failed to demonstrate any business necessity as justification for its maintenance of a promotional system with discriminatory impact." *Id.* at 148.

Here, the district court relied upon *Claiborne v. Illinois Central Railroad, supra,* in finding the Brotherhood in violation of Title VII. *See* District Court Order Denying Motions for Summary Judgment, No. 576–54, at 10 n.10 (S.D.Ga., filed June 27, 1979), *incorporated by reference into Jackson v. Brotherhood of Railway Carmen of the United States and Canada,* No. 576–54 at 1 (S.D.Ga., filed May 15, 1980). The district court required appellees to establish 1) the existence of past discrimination at the Waycross Yard, 2) that each appellee was qualified to perform as a carman, and 3) that after each appellee became qualified for the job, the collective bargaining agreement prevented them from attaining that position. As to the first issue, the district court found that from the time the appellees were hired in the early 1940's until 1965, the railroad pursued discriminatory hiring practices by employing blacks only as laborers and carman helpers, refusing to hire them as carmen, carman apprentices, or helper apprentices.[34] Only carman ap-

recruited into the apprenticeship program until 1965, and the helpers, all of whom were black as of 1960, were denied promotion on account of Appendix F of the collective bargaining agreement that requires helpers to serve as "set-up" carmen before qualifying for the carmen's roster.

**34.** In its order denying the motions for summary judgment, the district court observed that the evidence uncontrovertably established that when the plaintiffs were first hired in the early 1940's the railroad did not employ blacks as carmen or carman apprentices and that no black served as a carman apprentice or helper apprentice until 1964. Taking judicial notice of the fact that blacks constituted a sizeable percentage of the general population of Waycross, Georgia, the court concluded that the plaintiffs made out a prima facie case of past racial discrimination, which the defendant did not attempt to rebut. The Brotherhood argues that the district court committed reversible error by taking judicial notice of the disparity between the number of blacks hired and the black population of Waycross, Georgia and by disposing of the issue on summary judgment. We first

note that the district court did not reach a holding on this issue on summary judgment. The court denied the plaintiffs' motion for summary judgment without reservation. The court's disposition of this issue did not take legal effect until it was incorporated by reference into the court's findings of fact and conclusions of law made after the trial. Furthermore, the appellant abandoned this issue for trial and appeal by entering into a pre-trial order in which it admitted that "[a]t the time of their initial employment by ACL and continuing until 1965 that railroad did not assign black employees to apprenticeships" and that even though blacks and whites were hired as helpers, only whites were assigned to the position of helper apprentices. The pre-trial order of the district court "when entered controls the subsequent course of the action, unless modified at trial to prevent manifest injustice." Fed.R.Civ.P. 16. "Thus matters stipulated in the pre-trial order are binding upon the parties absent some modification, *see United States v. Tampa Bay Garden Apartments, Inc.,* 294 F.2d 598 (5th Cir. 1961), and normally cannot be pursued on appeal." *Funding Systems Leasing*

prentices and helper apprentices were entitled to the position of carman as a matter of right. With respect to the second issue, the district court determined that all of the appellees but Parker were qualified to perform carman's work as of 1955 and that Parker was qualified to serve as a carman as of 1960. Finally, the district court concluded that "the promotional system of the collective bargaining agreement, though facially neutral and applied in a neutral fashion, has clearly perpetuated the effect on plaintiffs of the past hiring discrimination." *Id.*

In reviewing the district court's findings, we apply the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 368, 68 S.Ct. 525, 529, 92 L.Ed. 746 (1948). After carefully reviewing the record, we find that the evidence amply supports the district court's conclusions that the appellees as black carman helpers were the victims of past discrimination in hiring, that they were qualified to serve as carmen by 1960, and that the promotion provision requiring carmen helpers to serve 8320 hours as "set-up" carmen has perpetuated the effect on appellees of past discrimination. Based upon these findings, we cannot say that the district court was clearly erroneous in concluding that the promotion system had a discriminatory impact upon appellees. We therefore turn to whether the Brotherhood demonstrated any business justification for the promotional system.

██ Once a plaintiff has established the discriminatory impact of an employment practice, the defendant bears the burden of proving that the practice is justified by a business necessity. *Griggs v. Duke Power Corp. v. Pugh,* 530 F.2d 91, 95 (5th Cir. 1976). The Brotherhood therefore conceded the existence of past racial discrimination at the Way-

Co., *supra* at 431–32; *Pettway v. American Cast Iron Pipe Co., supra* at 244–45. "The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced or accomplish it equally well with lesser differential racial impact." *Pettway v. American Cast Iron Pipe Co., supra* at 245, citing *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).

██ The district court concluded that the Brotherhood did not successfully rebut the appellees' showing of employment discrimination. We agree. At trial, the Brotherhood defended on four grounds. First, it argued that the appellees were not qualified to be promoted to carmen. As discussed above, the court properly found that each appellee was qualified as of 1960. Second, the Brotherhood contended that the SCL and not the union had sole responsibility for promotions. However, the promotion system attacked by appellees is contained in the collective bargaining agreement negotiated in 1967, and, therefore, the Brotherhood as well as the railroad can be held liable for its discriminatory impact. "A union is jointly liable with the employer for discrimination caused in whole or in part by the provisions of a collective bargaining agreement. As the representative of the black employees, the union is charged with the duty of protecting them from invidious treatment." *Parson v. Kaiser Aluminum & Chemical Corp., supra* at 1389. Third, the Brotherhood urged that the promotion provision did not violate Title VII because it was initially negotiated and adopted on a national basis by all of the railroads and the

cross Yards before trial and cannot now argue that the district court improperly disposed of the issue.

union, independent of the communities where the railroads operated and the racial makeup of their employees. This contention however does not justify the discriminatory promotion system as a business necessity. It does not demonstrate that the discriminatory promotion system contained in the collective bargaining agreements between the union and the SCL is "necessary to the safe and efficient operation" of the railroad. Finally, the Brotherhood's primary position at trial seemed to be that the appellees were not discriminated against by the Brotherhood because they had not satisfied the promotion requirements of Appendix F. This argument merely begs the question whether or not the promotion provision was justifiable as a business necessity. Thus, none of the Brotherhood's defenses establish a demonstrable relationship between the requirement that helpers serve 8320 hours as "set-up" carmen before qualifying for the carmen's roster and the successful performance of the job of carman. We therefore find that the Brotherhood has failed to justify the discriminatory promotion system contained in Appendix F as a business necessity. Having already determined that the promotion system contained in Appendix F of the 1967 collective bargaining agreement had a discriminatory impact on appellees, we find that the district court properly held the Brotherhood in violation of Title VII.

B. Disparate Treatment Analysis

 In *McDonnell Douglas Corp. v. Green, supra,* the Supreme Court explained

the "disparate treatment" test for establishing racial discrimination. To establish a prima facie case of racial employment discrimination, the plaintiff must prove by a preponderance of the evidence: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications." *McDonnell Douglas Corp. v. Green, supra* at 802, 93 S.Ct. at 1824. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[35] If the plaintiff successfully establishes a prima facie case, then the burden of production, not persuasion, shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its actions. *Texas Department of Community Affairs v. Burdine, supra* at 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216. Should the defendant carry this burden, the plaintiff must establish by a preponderance of the evidence that the defendant's non-discriminatory reasons are pretextual. The plaintiff bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff, although such intent may under some circumstances be inferred from the mere fact of differences in treatment. *Id.* at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216.

The district court initially analyzed this case under the disparate impact test in

**35.** As the Supreme Court explained in *Furnco Construction Corp. v. Waters, supra* at 577, 98 S.Ct. at 2949:

The central focus of the inquiry in a case such as this is always whether the employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin." *Teamsters v. United States,* supra, 431 U.S. 324 at 335 n.15, 97 S.Ct. 1843 at 1854 n.15, 52 L.Ed.2d 396. The method suggested in McDonnell Douglas for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under McDonnell Douglas raises an in-

ference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible facts. See *Teamsters v. United States,* supra, at 358 n.44, 97 S.Ct. at 1866 n.44. And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

reaching its verdict against the Brotherhood. In its motion to vacate the judgment, the Brotherhood argued that the district court erred by not using the disparate treatment analysis. The district court rejected appellant's contention, stating that it at least "implicitly held that the plaintiffs met the *McDonnell Douglas* standard of proof for Title VII cases." The district court observed that "[e]ven a cursory examination of the trial record reveals that plaintiffs proved they were members of the protected class, they were qualified to perform carmen's work, they sought promotion and they were denied promotion when the Brotherhood caused white persons to be promoted over them. Defendant's argument is totally without merit." District Court Order Denying Motion to Vacate the Judgment, No. 576-54, at 8 (S.D.Ga., filed Oct. 6, 1980).

We find that the district court was not clearly erroneous in its finding of discriminatory treatment. The evidence shows that the black appellees were qualified to perform as carmen as of 1960, that they sought promotion, and that the Brotherhood never attempted to have the appellees upgraded. It further shows that appellees were denied promotion as a result of the promotion system contained in Appendix F of the collective bargaining agreement of 1967 and that other white employees were promoted ahead of them. The Brotherhood offered as "legitimate, non-discriminatory" reasons for the appellees not being promoted that the appellees had not satisfied the requirements of Appendix F, that Appendix F was adopted with no intention to discriminate against the appellees, and that the Brotherhood had no control over who the railroad chose to promote. We think that the appellees successfully proved these reasons to be pretextual by establishing that 1) the Brotherhood acquiesced to racially discriminatory hiring and promotion practices prior to 1965; 2) the promotion requirements of Appendix F served to perpetuate prior discrimination and could not be justified as a business necessity; 3) the union negotiated Appendix F in order to attain more control over promotion decisions and could have insisted on promotion requirements that would have permitted the advancement of qualified carman helpers; and 4) the railroad had in the early 1950's promoted black carman helpers to carmen at the insistence of Mr. Roy Osborne, the chairman of the grievance committee of the union local, who felt it unfair that qualified blacks were denied promotion, but that the Brotherhood had not attempted to seek the promotion of qualified black carman helpers since that time, despite requests by appellees. Based upon this evidence, we conclude that the district court was not clearly erroneous in finding that appellees satisfied their ultimate burden of proving by a preponderance of the evidence that the Brotherhood intentionally discriminated against them. We therefore affirm the district court's judgment that the Brotherhood violated Title VII under both the disparate impact and disparate treatment tests.[36]

## V. *Exclusion of Testimony*

The next claim raised by the Brotherhood is that the district court committed reversible error by refusing to permit Mr. Edward Wheeler, a representative of the Brotherhood, to testify. When the Brotherhood sought to call Mr. Wheeler to testify on its behalf, appellees objected on the ground that Mr. Wheeler was not named in the pre-trial order. The Brotherhood re-

---

36. The Brotherhood contends that the district court committed reversible error by disposing of genuine issues of fact on summary judgment. In its order denying the summary judgment motions of both parties, the district court thoroughly discussed the facts of the case and the applicable law, and stated that the only real issue in the case was whether the plaintiffs were qualified to be promoted to carmen. The record is clear, however, that the district court

denied the motions for summary judgment without reservation and that the court's pronouncements were merely *dicta. See* District Court Order Denying Motions for Summary Judgment, *supra*. Not until that order was incorporated by reference into the district court's Final Judgment Order of May 15, 1980 did the district court's findings take legal effect. We therefore find the Brotherhood's contention meritless.

sponded that the court should allow it to call the witness because the order was improperly drafted. According to appellant, the order should have stated that the Brotherhood intended to call James E. Yost, President, Railway Employees Department, AFL–CIO, or his nominee. Instead, the pre-trial order read "the Brotherhood will have available at trial James E. Yost, President, Railway Employees Department, AFL–CIO nominee." The district court sustained the appellees' objection, finding that the Brotherhood had signed the pre-trial order and therefore could not argue that the order was in error and that the appellees would be prejudiced by permitting Mr. Wheeler to testify because they had had no prior opportunity to interrogate the witness or otherwise prepare for him.

Rule 16 of the Federal Rules of Civil Procedure states that the pre-trial order governs the course of the trial unless modified at trial to prevent manifest injustice. *Central Distributors, Inc. v. M.E.T.C., Inc.*, 403 F.2d 943 (5th Cir. 1968).

> The decision to modify or enforce a pre-trial order is discretionary with the trial court and will not be disturbed on appeal absent an abuse of discretion. *E.g., Davis v. Duplantis*, 448 F.2d 918 (5th Cir. 1971); *Wright Rootbeer Co. of New Orleans v. Dr. Pepper Co.*, 414 F.2d 887 (5th Cir. 1969). Failure of a district court to allow defendant to present a witness who was not named in a required witness list to testify contrary to the plaintiff's evidence is not an abuse of discretion if the defendant was on notice that the plaintiff would present the evidence at issue. *Keyes v. Lauga*, 635 F.2d 330, 335 (5th Cir. 1981).

*Newman v. A. E. Staley Mfg. Co.*, 648 F.2d 330, 333 (5th Cir. 1981). Appellant does not contend that it sought to call Mr. Wheeler to rebut evidence that it was not on notice would be presented. For this reason, as well as those relied on by the district court, we find that the court below properly exer-

cised its discretion in refusing to permit Mr. Wheeler to testify. Moreover, although appellant alleges that it was greatly prejudiced by not being allowed to call Mr. Wheeler, the Brotherhood made no offer of proof at trial as to the excluded testimony; hence, proof of manifest injustice cannot be shown, and error may not be predicated on its exclusion. Fed.R.Evid. 103(a)(2);[37] *Mills v. Levy*, 537 F.2d 1331, 1333 (5th Cir. 1976).

## VI. *The Back Pay Award*

The district court did not resolve the issue of back pay when it entered its final judgment order on the appellees' Title VII claims. Instead, the district court encouraged the parties to reach an agreement on this issue within 45 days, after which time the appellees could apply to the court for a hearing or ruling on any disputed issue of law or fact. The parties were unable to reach an accord, and on August 12, 1980, the appellees filed a motion for summary judgment on back pay, requesting $43,-133.14. Appellant, on August 21, 1980, sent a personal letter to the district court requesting a two week extension of time in which to respond and sent another personal letter to the court on August 26, 1980 requesting permission to defer the preparation of a response until after the court had ruled on its motion to vacate the judgment. The Brotherhood failed to file a motion for an extension of time to respond, and the court, not considering the personal letters as proper motions, never ruled on them. At no time did the Brotherhood inquire into the court's disposition of its requests. Local Rule 6.2 provides that a party opposing a motion for summary judgment shall have 20 days to serve and file a response and that failure to do so shall indicate that there is no opposition to the motion. S.D. Ga.R. 6.2. On September 23, 1980, six weeks after appellees filed their motion for summary judgment, having received no re-

---

37. Fed.R.Evid. 103(a)(2) provides that: "(a) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (2) [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

sponse from the Brotherhood, the court granted summary judgment for the appellees.

The Brotherhood immediately filed a motion under Rule 60(b) to set aside the back pay award, arguing that its failure to file a response to the appellees' summary judgment motion was excusable under Rule 60(b) because it reasonably relied upon its letter of August 26, 1980 for an extension of time. According to the appellant, the court on prior occasions had entertained such informal requests. The court found this contention totally meritless. Although the court had acted on letters requesting the rescheduling of the pre-trial conference, the pre-trial order, and the period that the parties had to reach agreement on the issue of back pay, the court previously had neither received nor acted upon an informal request for an extension of time to respond to a motion before the court. The court also observed that appellant apparently assumed that its informal request for an extension of time not only sufficed as an appropriate motion but was self-executing. The Brotherhood never inquired into nor received a disposition by the court of its request. In addition, the court noted that the appellant had been dilatory in presenting its substantive claims throughout the litigation. For these reasons, it denied the Brotherhood's motion, concluding that failure to respond to appellees' motion for summary judgment resulted not from "mistake, inadvertence, surprise, or excusable neglect," Fed.R.Civ.P. 60(b)(1), but rather from inexcusable neglect.[38]

■ On appeal, the Brotherhood urges that the district court erred in denying its Rule 60(b) motion because appellant's failure to file a response was reasonable and "at worst the choice was a regrettable 'mistake' or 'excusable neglect' within the meaning of Rule 60(b)." In order to succeed, appellant must establish that the district court abused its discretion in refusing to set aside its judgment, *Villareal v. Braswell Motor Freight Lines, Inc.*, 545 F.2d 978 (5th Cir. 1977); *Hand v. United States*, 441 F.2d 529 (5th Cir. 1971), and that the record shows affirmatively that had the Brotherhood actually contested the claim, it "would have established a meritorious defense that probably would have been successful." *United States v. $22,640.00 In United States Currency*, 615 F.2d 356, 360 (5th Cir. 1980). The purpose of the latter requirement is to prevent needless protraction of litigation. With respect to the first requirement, the district court properly exercised its discretion in refusing to set aside its judgment. The Brotherhood's failure to respond to the appellees' motion for summary judgment constituted nothing more than inexcusable neglect. Appellant's reliance upon its letter of August 26, 1980 for an extension of time in which to file a response was unreasonable since appellant never received notice that the court had granted its request and never inquired into whether the court planned to do so. A party simply cannot purposely improvise the rules of procedure as did appellant and later ask the court to set aside its summary judgment on damages under Rule 60(b), *see Smith v. Stone*, 308 F.2d 15 (9th Cir. 1962), especially where as here the movant has been dilatory throughout the litigation in presenting its substantive claims. Thus, we affirm the district court's denial of appellant's Rule 60(b) motion without addressing whether or

---

**38.** The Brotherhood argued in the district court that it was entitled relief under Rule 60(b)(1) and (6), Fed.R.Civ.P., which state: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertance, surprise, or excusable neglect; ... or (6) any other reason justifying relief from the operation of the judgment." The former Fifth Circuit has held that these provisions are mutually exclusive and that relief cannot be had under clause (b)(6) if it could have been available under clause (b)(1). "Where the clauses (b)(1), (2), (3), (4), or (5) provide coverage for the movant's claim, relief may not be obtained pursuant to clause (b)(6)." *Gulf Coast Building & Supply Co. v. International Brotherhood of Electrical Workers*, 460 F.2d 105, 108 (5th Cir. 1972). Here, because relief could have been had under Rule 60(b)(1), the district court properly did not consider the Brotherhood's motion under Rule 60(b)(6).

not the record reveals a meritorious defense that the Brotherhood could have asserted with probable success.

■ Appellant also claims that the district court's award of back pay to the plaintiffs is erroneous as a matter of law. This assertion is raised as part of the Brotherhood's appeal from the district court's denial of its motion to vacate under Rule 60(b). *See* No. 80–7965. It is well settled that "an appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." *Browder v. Director, Department of Corrections of Illinois*, 434 U.S. 257, 263 n.7, 98 S.Ct. 556, 560 n.7, 54 L.Ed.2d 52 (1968). *See Saenz v. Kennedy*, 178 F.2d 417, 419 (5th Cir. 1949). An appellant may attack the underlying judgment only on direct appeal from the judgment itself. Here, the Brotherhood does not argue in its direct appeal from judgment that the district court erred in awarding back pay to the appellees. *See* No. 80–7846. The claim is therefore abandoned. Fed.R.App.P. 28(a)(4); *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438, 440 (5th Cir. 1980); *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 324 (5th Cir. 1977). Merely because we have chosen to consolidate the appeal from final judgment with the appeal from the denial of appellant's Rule 60(b) motion does not cure the Brotherhood's failure to properly challenge the merits of the back pay award. The consolidation of appeals is done solely for the convenience of the court and does not affect our treatment of the separate appeals. We therefore refuse to consider the merits of the district court's award of back pay because the Brotherhood has improperly raised it on appeal from the denial of the Rule 60(b) motion and has not asserted it on appeal from final judgment.

## VII. *The § 1981 Claims*

At the close of all the evidence, the appellees filed a motion for a partial directed verdict on their § 1981 claims, arguing that there was no genuine issue of fact regarding their qualifications for the position of carman. The district court denied appellees' motion and submitted the claims to the jury on essentially two grounds: whether each appellee was qualified to do carman's work and whether the Brotherhood intentionally discriminated against the appellees in depriving them of promotion. Originally, the appellees wanted the jury to render a special verdict on these issues, but in response to an objection by the Brotherhood to the issues being submitted in special form, the appellees agreed to having the jury render a general verdict. After the jury found for the Brotherhood, the appellees moved to have the verdict set aside and for a new trial, arguing that there was insufficient evidence to support a finding that they were unqualified to serve as carmen and that since the verdict could have been based on that ground, a new trial was required. The district court denied the motion, concluding that it could not be said that the verdict was against the great weight of the evidence. *See Spurlin v. General Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976). Appellees did not move for judgment notwithstanding the verdict, apparently realizing that such relief was not appropriate since it had sought a directed verdict on only one of two grounds upon which the jury could have relied in rendering its general verdict.

■ On appeal, appellees urge that we remand the case for a new trial because the district court erred in not directing a verdict on the issue of appellees' qualifications to serve as carmen. Their failure to file a motion for JNOV is not fatal to their appeal. A party's failure to move for JNOV does not preclude appellate review of an earlier motion for a directed verdict. However, where a motion for JNOV has not been filed, the only relief a party may obtain in this court is the ordering of a new trial; we may not direct the district court to enter judgment for the appellant. *See Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970), *cert. denied*, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *Yorkshire Indemnity Co. of N.Y. v. Roosth & Genecov Production Co.*, 252 F.2d 650, 657–58 (5th Cir. 1958).

In turning to the merits of appellees' claim, we first observe that a district court should direct a verdict only if after reviewing all of the evidence in the light most favorable to the opposing party, it believes that the facts and inferences point so strongly in favor of one party that reasonable men could not arrive at a contrary verdict. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc). However if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. Of course, "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Boeing Co. v. Shipman, supra* at 374. Here, the evidence was such that reasonable-minded jurors could have concluded that the appellees were unqualified for the job of carman. Although the evidence showed that appellees had successfully served as "set-up" carmen and had performed many of the duties of carmen during their long tenure as carman helpers, the evidence when viewed in the light most favorable to the Brotherhood could have supported the conclusion that the appellees were not qualified because they had not sufficiently been exposed to some of the skills required of that position. Thus we find that the district court properly denied the appellees' motion for a directed verdict on this issue and decline to remand the case for a new trial.[39]

For the above reasons, we AFFIRM.

---

**39.** It is unclear whether appellees also appeal from the district court's denial of their motion for a new trial. Based on the foregoing, we do not think that the district court abused its discretion in denying the motion. *See Ellis v. Chevron U.S.A. Inc.*, 650 F.2d 94, 97 (5th Cir. 1981); *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973) (review limited to a determination of whether there is an "absolute absence of evidence to support the jury's verdict.").