**James HILL, et al.,
Plaintiffs-Appellants,**

**v.**

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY,
Defendant-Appellee.**

**James HILL, et al., Plaintiffs-Appellees,**

**v.**

**METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY,
Defendant-Appellant.**

**Nos. 85–8845, 86–8026.**

United States Court of Appeals, Eleventh Circuit.

April 11, 1988.

Isabel Gates Webster, Gary W. Walker, Atlanta, Ga., for James Hill et al.

Paul A. Howell, Jr., Kutak Rock & Campbell, Atlanta, Ga., for Metropolitan Atlanta Rapid Transit Auth.

Before KRAVITCH and CLARK, Circuit Judges, and MORGAN, Senior Circuit Judge.

CLARK, Circuit Judge:

One of these two consolidated appeals is from a judgment in favor of the employer, Metropolitan Atlanta Rapid Transit Authority (MARTA) in an action brought initially by fifty plaintiffs whose applications for employment with MARTA were rejected. The basis of the complaint was racial discrimination in MARTA's hiring practices. The second appeal is from the district court's refusal to grant MARTA attorney's

fees.[1] We affirm in part and reverse and remand in part.

With respect to the merits of the plaintiffs' claims, two dispositive orders were entered by the district court. On April 30, 1984, Judge Owen Forrester granted defendant's motion for summary judgment as to a portion of the claims of certain plaintiffs. 591 F.Supp. 125. The plaintiffs claim that the court erred in finding that the claims of some plaintiffs were not timely filed under 42 U.S.C. §§ 1981, 1983 (1982) and/or Title VII, 42 U.S.C. § 2000e (1982). No appeal is taken from the court's denial of the claims under 42 U.S.C. § 1985 (1982). The second dispositive order was entered by Judge Robert L. Vining, Jr. on September 4, 1985, and dismissed the balance of the plaintiffs' claims pursuant to defendant's motion under Fed.R.Civ.P. 41(b). The plaintiffs contend that the court erred in finding that they did not make out a prima facie case.

We shall discuss first the background and facts leading to the orders of the district court, then the individual claims of those plaintiffs whose cases were dismissed pursuant to Rule 41(b), and finally the claims of those plaintiffs whose suits were found completely barred by the applicable statutes of limitations. Only thirty-nine of the original plaintiffs have appealed.

## I. BACKGROUND AND FACTS

MARTA is a public corporation operating the transit system in Atlanta and those portions of Fulton and DeKalb Counties not within the City of Atlanta. It purchased the Atlanta Transit System in 1972 and then expanded with the assistance of federal funds. MARTA sought from its inception to ensure equal employment opportunities without regard to race or sex. *See Whatley v. MARTA*, 632 F.2d 1325 (5th Cir.1980). During the period relevant to this lawsuit, MARTA had approximately 2,700 employees, of whom 52% were white and 48% were black. The population figures for this period reflect that the two counties served were 65% white and 35% black. Because this case principally involves applicants for bus drivers, it is noted that 51% of the drivers were black and 49% white.

In 1977 and 1978 certain members of MARTA's Board of Directors became concerned about the racial makeup of MARTA's employees. Three or more Board members were of the view that MARTA had a disproportionate number of black bus operators and that there was a perception in the community that whites could not obtain these jobs. Consequently, in November of 1978, MARTA began considering the applications of minimally qualified whites for positions as bus operators ahead of the applications of blacks who were minimally qualified. Since the majority of the plaintiffs were applicants for the position of bus operator and there was no evidence that there was any discrepancy in the treatment of white and black applicants for other positions, the balance of the discussion at this stage will pertain only to those who applied for the position of bus operator.

Applications for jobs in the Operations Division[2] were available at the office of that division on Summit Drive. In the reception room on a bulletin board and on cards were instructions with respect to completing the application. Applicants submitted their completed applications to the receptionist. They were told that their applications would be considered and that they would be contacted if they were minimally qualified and a position was open. Applicants were also told, if they inquired, that their applications would be kept on an active list for one year, after which they would not be considered. William Dean was in charge of the employment office for

---

1. Because there are two appeals, we will not use the term appellants, but will refer to the parties as "plaintiffs" and "MARTA".

2. This division included bus operators, mechanics and others who serviced the operating equipment. Applications for the other division, Administrative, were made at MARTA's downtown office. All employees not in Operations were in Administrative.

Operations and his assistant was Brady Dorsey.

Dean's and Dorsey's testimony revealed that Dorsey screened the applications and that there was a rejection rate at that stage of approximately 85%. A log was kept of all applications, and they were classified AI, application incomplete; NI, not interested; and QA, minimally qualified applicant. Applications would be deemed incomplete if, for example, they bore no signature, revealed an unexplained gap in past employment, failed to list the name of a former supervisor who could be contacted, or did not include the applicant's age. Applications would be labeled "not interested" if they revealed, for example, that the applicant was under the age requirement of 25, had a frequent turnover in employment, had a criminal record, or lacked sufficient education. The "QA" list was comprised of the remainder of the applicants and these were the only applicants who would advance further into the hiring process.

Dean testified that attrition and the addition of new routes resulted in the need for about 12 operators a month or 150 a year. He estimated that there were about 6,000 applicants for the bus operator position in the 1978–79 years.[3] QA applications were retained for one year from the date of application. Since the number of those minimally qualified far exceeded the number hired, many on the QA list were never contacted by MARTA. The processing of those who were contacted involved first the administration of a validated test,[4] then an interview, and finally an Equifax investigation of the applicant's background, including any criminal and traffic violations. If an applicant passed through all these stages successfully and could obtain the appropriate licenses, he was deemed fully qualified for the position.

Dean admitted that from November 1978 until November 1979, the applications of those on the QA list for bus operator were considered out of sequence, with white applicants being considered ahead of blacks.[5] An audit of the Operations Division hiring conducted internally by MARTA and covering the period involved here revealed that black men and women were being hired 153 and 126 days, respectively, after they made the QA list, while white men and women were being hired just 48 and 33 days after they qualified. As a result, on November 16, 1979, the Operations employment office was directed to consider those on the QA list only in the order of their applications.[6] It is important to note that none of these plaintiffs claims he or she was subject to discrimination as a result of this out of sequence processing.

At the same time, new procedures were instituted for the handling of those applicants who did *not* make the QA list during the period in which the acceleration took place. This is the category into which most of these plaintiffs fall. The names of persons who had applied between October 1, 1979 and November 16, 1979 but had been rejected were compiled on what was called the "B" list (the "A" list being those applicants from October 5 to November 16 who were already on the QA list). The people on the B list were written letters advising

3. Dean's estimates were not totally accurate. MARTA's audit of employment of bus operators from October 1, 1978 to September 30, 1979 reflects that 425 were employed that year and 8,884 applied. Record, Plaintiffs' Exh. 77. We will discuss this audit more fully later.

4. Appellants do not challenge this test as racially discriminatory.

5. The record does not reveal whether this acceleration took place at the beginning of the process, i.e., by not calling on certain black applicants to take the examination, or at the end, but we do not believe that this affects plaintiffs' cases in any way. Neither party discusses the point.

6. A letter dated May 29, 1980 from an official in the Urban Mass Transportation Administration (UMTA) to MARTA's Chairman of the Board addressed this problem. UMTA asked that MARTA contact all those applicants who had made the QA list but not been offered a job, test them, and offer each a job "in the order of application before anyone else can be hired." Record, Plaintiffs' Exh. 78 at 4. There is no written evidence in the record that MARTA responded specifically to this letter, but there was ample testimony from James Price, MARTA's Personnel Manager at the time, and William Dean that corrective efforts were undertaken *prior* to UMTA's letter.

that their applications were being reprocessed. The content of these letters will be discussed later in connection with each plaintiff individually. A "C" list was also compiled and included the names of all applicants between November 16, 1979 and December 31, 1979. No applications were accepted after December 31, primarily to give the employment office time to review the applications from the B and C lists.

The only direct evidence of discrimination in MARTA's hiring practices was the uncontradicted testimony that during the thirteen-month period minimally qualified whites from the QA list were considered in advance of minimally qualified blacks. All of the other testimony was to the effect that there was no discrimination at the level at which all but four or five of these plaintiffs were rejected, i.e., before making the QA list. There was also evidence that between 1972 and 1978, black applicants had been considered sequentially in advance of white applicants, until by 1978, 51% of the bus operators were black.

Even so, a number of the plaintiffs, all of whom were black, presented evidence that they applied during or immediately before the relevant period, that their applications were complete, and that they met all the minimum age, educational, and background (steady employment and no criminal record) qualifications, and still they did not make the QA list. Additionally, MARTA's audit of the applicant flow from October 1, 1978 to September 30, 1979 included some statistics that add support to plaintiffs' case.

| | No. of Applicants | % | No. Tested | % | No. Hired | % | No. of Employees | % |
|---|---|---|---|---|---|---|---|---|
| Maj. | 1863 | 21% | 601 | 67% | 272 | 64% | 1168 | 54% |
| Min. | 7021 | 79% | 290 | 33% | 153 | 36% | 992 | 46% |
| Tot. | 8884 | 100% | 891 | 100% | 425 | 100% | 2160 | 100% |

The figures above are taken directly from MARTA's internal audit, which was admitted in the district court as Plaintiffs' Exhibit 77. They reveal that the probability of employment for a majority applicant was 14.6%, while the probability of employment for a minority applicant was only 2.2%. More important, however, for the purposes of this lawsuit, are the percentages of each group that made the testing stage, which, by definition, means they made the QA list. The data reveals that while 33% of majority applicants—1601/1863—reached the testing stage, only 4%—290/7021—of the minority applicants did.

## II. THE DISPARATE TREATMENT CLAIM

It is well settled that any racial discrimination claim based on disparate treatment requires a prima facie showing that the employer acted with discriminatory intent. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). A prima facie showing gives rise to a rebuttable presumption that an employer has engaged in racially discriminatory practices. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If a case has been fully tried, this presumption drops from the case and the concept of a prima facie case becomes irrelevant. *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1481–82; *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. At that point, the trier of fact's ruling on the existence of discriminatory intent vel non becomes a purely factual question, subject to a clearly erroneous standard of review. *Pullman-Standard v. Swint*, 456 U.S. 273, 288–89, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Where, however, a plaintiff's claim is dismissed at the close of his evidence for his failure to make a prima facie case, the question is one of legal sufficiency, and an appellate court's review is plenary. *See, e.g., Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct.

2943, 2949, 57 L.Ed.2d 957 (1978) ("the Court of Appeals was justified in concluding that as a matter of law respondents made out a prima facie case of discrimination"); *see also Aikens*, 460 U.S. at 715, 103 S.Ct. at 1481 (referring to district court dismissals for the plaintiff's failure to make a prima facie case).

▮ A plaintiff may establish a prima facie case in one of at least two ways. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984); *see also Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6; *Furnco Construction*, 438 U.S. at 576–77, 98 S.Ct. at 2949. He may present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude. *See Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982). Or, in the absence of direct evidence of discrimination, he may rely on the combination of factors set forth in *McDonnell-Douglas Corp. v. Green* and show simply

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). If a plaintiff chooses the direct method, and the evidence is found credible, the burden of *persuasion* shifts to the employer to prove by a preponderance that it would have made the same decision or engaged in the same conduct in the absence of the discriminatory factor. *Bell v. Birmingham Linen Service*, 715 F.2d at 1558. If a plaintiff proceeds under the indirect, *McDonnell-Douglas* formula, the

burden of *production* shifts to the employer to articulate a legitimate, nondiscriminatory reason for its conduct or decision. *McDonnell-Douglas*, 411 U.S. at 803, 93 S.Ct. at 1824.

▮ When one examines the plaintiffs' evidence in this case, it becomes clear that the evidence fits neatly into neither category of proof. With respect to the plaintiffs who applied to become bus operators, there was evidence that the plaintiffs were black, applied for the bus operator position, and some met MARTA's requirements for making the QA list, but instead were classified NI or AI, and that, meanwhile, MARTA continued to accept applicants of the same qualifications. This evidence was obviously intended to satisfy the requirements of *McDonnell-Douglas*. The plaintiffs presented other evidence, however, that can more readily be described as direct evidence of discrimination: namely, the uncontradicted testimony that once black applicants actually reached the QA stage, they were discriminated against in favor of white persons appearing on the QA list. Still more evidence reflected the plaintiffs' attempt to establish a case of disparate impact discrimination: MARTA's own applicant flow statistics reveal a startling contrast in the percentages of white and black applicants who made it to the testing stage. We are not unmindful that during the plaintiffs' case oral testimony indicated that at the stage of reviewing the applications there was no racial discrimination, but conflicts in testimony are to be dealt with only after the issue of the sufficiency of the plaintiffs' case. Moreover, mere protestations of lack of discriminatory intent and affirmations of good faith do not suffice to rebut a prima facie case. *Castaneda v. Partida*, 430 U.S. 482, 499 n. 19, 97 S.Ct. 1272, 1282 n. 19, 51 L.Ed.2d 498 (1977).

Although it is quite difficult to discern from the district court's oral findings [7] pre-

---

7. We note that the district court did not enter written findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 41(b), the authority under which the court dismissed the plaintiffs' claims. We note further

that this fact alone is ground enough for us to remand the case. *Crawford v. United States Steel Corp.*, 660 F.2d 663, 666 (5th Cir. Unit B 1981). The complexity of this case and the number of plaintiffs involved offer compelling

cisely why the court found the claims of those who applied for the bus operator position lacking as a matter of law, it is clear to us that, with the exception of those whose applications or testimony revealed that they were not qualified, these plaintiffs made out a prima facie case. We are well aware that statistics alone—such as the applicant flow chart on which plaintiffs rely—cannot establish a prima facie case of disparate treatment. *Carmichael v. Birmingham Saw Works*, 738 F.2d at 1131. We are also unwilling to hold that direct evidence of discrimination at one level—here, the advance processing of white applicants who had already qualified over black applicants who had already qualified—necessarily means that there has been discrimination at another level, although we do note that here the same MARTA officials were involved in both decisionmaking processes. *Cf. Barber v. International Brotherhood of Boilermakers*, 778 F.2d 750, 761 (11th Cir.1985) (district court's finding of pretext clearly erroneous where based on a racial epithet uttered by a union official not involved with the decision complained of). Nonetheless, when the peculiar circumstances here are taken together, they raise an inference of discriminatory intent that requires MARTA to offer some explanation as to why apparently qualified black applicants for the bus operator position were not allowed to advance further in the hiring process.

█ MARTA insists that none of the plaintiffs could have made out a prima facie case of disparate treatment because they did not present "similarly situated" white persons who were treated differently, presumably white persons whose applications looked much like these black plaintiffs' and who nonetheless made the QA list. MARTA apparently draws this argument from the fourth requirement under *McDonnell-Douglas*. We decline to adopt it for several reasons.

First, *McDonnell-Douglas* itself does not require that a plaintiff identify specific persons who were hired or considered after him; the Court instructed only that he

show "that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 803, 93 S.Ct. at 1824. Under the circumstances of this case, MARTA a fortiori continued to seek applicants of the plaintiffs' qualifications; the plaintiffs' very complaint is that MARTA was defying *its own* ongoing statement of qualifications when it kept them off the QA list. Second, in *Texas Department of Community Affairs v. Burdine*, the Court offered an alternative formulation of the *McDonnell-Douglas* requirements. In *Burdine*, the Court stated: "The plaintiff must prove by a preponderance of the evidence that she applied for an available position, for which she was qualified, but was rejected *under circumstances which give rise to an inference of unlawful discrimination*." 450 U.S. at 254, 101 S.Ct. at 1094 (emphasis added). Having shown indisputably that there was discrimination in the hiring process at the level just above that at which they were rejected, and that drastically fewer black applicants were surviving the screening process, the plaintiffs set forth circumstances raising an inference of unlawful discrimination.

Finally, even if we were to accept that the fourth requirement of *McDonnell-Douglas* mandates a specific showing that a white with a similar application made it onto the QA list, we noted earlier that plaintiffs are not required to adopt a *McDonnell-Douglas* approach. A prima facie case of disparate treatment can be established by any "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Construction*, 438 U.S. at 580–81, 98 S.Ct. at 2951. We hold that those plaintiffs, identified below, who proved that they applied for the bus operator position and were qualified under MARTA's own statement of qualifications did, under the circumstances prov-

---

support for the written-finding requirement of    Federal Rule 41(b).

en by the plaintiffs generally, establish a prima facie case of disparate treatment.[8]

The same cannot be said for the remainder of the plaintiffs. As will be described more fully below when we address each plaintiff individually, some of the plaintiffs who applied to become bus operators did not properly complete their applications or it was evident from their applications and/or testimony that they were not qualified. Four of the plaintiffs failed the written examination, which had been validated as not racially discriminatory. Finally, the plaintiffs who applied for positions other than that of bus operator failed to show that there were any openings or that there was any application process comparable to that employed for the bus operator position that might be working against them. *See Carmichael v. Birmingham Saw Works,* 738 F.2d at 1132 (regardless of which method of proof a plaintiff chooses, "he must point to a job that he was denied because of his race").

■ In essence, all of these plaintiffs relied solely on the evidence that MARTA discriminated when it advanced the applications of whites on the QA list over those of blacks. This evidence was not in and of itself sufficient to infer that MARTA was engaging in discriminatory practices throughout its entire operation and/or with respect to black applicants who clearly were not qualified.[9]

## III. THE INDIVIDUAL PLAINTIFFS

As discussed earlier in this opinion, the court considers the applicants for the bus operator position to be in a separate category from the other applicants. Thus, we will discuss first each individual plaintiff who applied for that position and summarize his or her contention in the appellate brief, his or her testimony and application, and the district court's comments. We will then address the claims of those plaintiffs who applied for other positions.

*Aaron Alexander*

Alexander sought employment as a bus operator on April 5, 1979. His application was coded NI. Alexander testified that he was 38 years of age and since December of 1977 had worked for the Atlanta Fire Department. Prior to that job, he had been a janitor at Fort McPherson and had worked at the Atlanta Public Library as a security guard. We have reviewed Alexander's application, it appears to be complete, and there is no obvious reason why it should have been rejected.

On July 18, 1980, Alexander was written by MARTA, the letter stating that MARTA

---

8. We note that at the beginning of his oral ruling on the Rule 41(b) motion, the district judge stated:

> I have some grave doubts that any of the plaintiffs have a claim, and I don't know whether there is such a thing as a quasi or halfway order to dismiss or not; but I think while they don't have claims, I think there are some things that maybe MARTA ought to do, and I want to talk with you about those after I go through these various claims.

Record, Vol. 10 at 2. Then, at the close of his ruling, he stated: "All right, let's go in my office and sit down and talk about some of these people. I don't think they have claims but I think there is one or two things that MARTA ought to do." *Id.* at 14. These statements, in addition to the court's failure to say anything specific about several plaintiffs other than that it was unclear what happened to their applications on reprocessing, comfort us in our conclusion that these plaintiffs' claims should be remanded.

9. Perhaps recognizing that their disparate treatment claims were fatally flawed, these plaintiffs urge us to hold that they made out a prima facie case of disparate impact. The only evidence they can rely on under this theory is the applicant flow chart. That chart, however, covers only the Operations Division, and thus cannot be properly relied upon as evidence that MARTA's hiring process had a disparate impact on those who applied for jobs in the Administrative Division. With respect to those plaintiffs who did apply for jobs in Operations, but whose claims we reject, we hold that there was sufficient unrebutted evidence during their own case of the business necessity of their rejection. Either they failed to file an application, it was not completely filled out, or they were physically unable to fill the positions they were applying for.

In this connection, the district court did not abuse its discretion in excluding the testimony of Dr. Samuel J. Tucker. It was not established that he had statistical experience, and in any event, those plaintiffs who did not establish a case of disparate treatment would not have benefitted from his testimony on the significance of the flow chart.

was updating its employment files for bus operator candidates and that he would be contacted. Thereafter, on August 29, 1980, a letter was addressed to Alexander stating that he was being written "as a result of an Equal Employment Opportunity Compliance Review conducted by the Urban Mass Transportation Administration." The letter further stated that MARTA was contacting all individuals who had applied for bus operator positions since July 1, 1978, and as those positions became available, MARTA would invite applicants, "in the order in which their original applications were filed" to complete the screening process; "Those persons found to be qualified will be offered employment in accordance with the date of their original applications." Finally, the letter informed Alexander that the process would commence, and "when your application date is reached in this process, you will be sent a letter inviting you to update your application and to arrange for an appointment to be interviewed."

There is no evidence that Alexander was ever contacted further by MARTA. At the close of plaintiffs' case, MARTA made its oral Rule 41(b) motion and argued to the court why certain plaintiffs had no case, but Alexander was not mentioned. The district court confirmed the date of Alexander's application and stated simply that "[t]here is no evidence that his name has been reached in the hiring list." As explained above, producing this evidence was not Alexander's responsibility.

*Patricia Bex*

Bex sought a position as bus operator on February 14, 1979. Her application was coded NI, although she met the minimum qualifications. Bex testified that she was 32 years of age and had previously worked as a nurse. She testified that she filled out the application and gave it to the receptionist, after which she waited an hour and a half and was asked to report to an upstairs office. There she was abruptly told that MARTA had no openings. Even so, she, like Alexander, received the two letters discussed above. MARTA's counsel urged in the Rule 41(b) motion argument that Bex

knew that she would not be employed when she applied on February 14, 1979, and thus she did not meet the § 1981 statute of limitations requirement or the Title VII 180–day requirement. The district court stated: "There is no evidence to show that she had experience that was required. Nor is there any evidence to show what happened, if and when her application was rereviewed by MARTA."

Our review of Bex's application reveals no defect in it. Although she might eventually have been disqualified because she had not been employed between 1975 and the date of her application in 1979, our review of MARTA's published statement of the qualifications required to become a bus operator reveals no requirement that Bex did not meet at the preliminary application stage. *See* Record, Plaintiffs' Exh. 79. The district court's finding that she lacked the qualifications required was thus clearly erroneous.

*Charles Gill*

Gill applied for a bus operator position on July 17, 1978, and again on July 17, 1979. At both times he was employed as a school bus driver, transporting children to and from school. His application seems to be complete in every respect. Although his age was 53, there is nothing in MARTA's statement of qualifications to suggest that there was a maximum age. In its Rule 41(b) argument MARTA made no reference to Gill. The district court merely stated that his applications were re-reviewed and that there is no evidence what was done with them or where he fell on the hiring list.

*Jesse Lee Hayes, Jr.*

Hayes applied to be a bus operator on July 26, 1979. He was 42 years old at the time, and had been employed twelve years as a fireman with the Atlanta Fire Department. Prior to that time he had been in the United States Air Force. Nothing appears to be missing from his application. He received the same two letters as Alexander. MARTA's counsel made no reference to Hayes in his Rule 41(b) argument. The district court stated only that Hayes' application fell in the same class as Gill's.

*Evelyn W. Hill*

Hill applied for the position of bus operator on August 29, 1979. Her application appears to be complete. Attached to her application was a resume, giving information in addition to that requested on the application. Hill received the two letters from MARTA described in Alexander's summary. MARTA made no reference to Hill in its Rule 41(b) argument. The district court stated simply that there was no evidence to reflect what happened to her application.

*James Hill*

James Hill applied for the position of bus operator on January 3, 1979. Hill's application appears to be complete and our review of it would indicate no reason for his name not having been placed on the QA list. There was no argument by MARTA's counsel at the Rule 41(b) proceeding. He, like Alexander, received the two letters from MARTA in 1980 with respect to the reprocessing of applications. The district court stated only that there was no evidence as to what happened to his application on re-review.

*Darrell Spear*

Spear's experience with MARTA falls into a category separate from the plaintiffs we have discussed thus far. He applied to become a bus operator on November 17, 1978. He received the two MARTA letters in July and September 1980 previously described in the discussion of Alexander. In September 1983, however, he was actually hired as a part-time driver and on July 5, 1984, he was hired to work full-time. He testified that white drivers were hired before him even though they had applied later and that this had given the white drivers higher seniority. MARTA's counsel did not argue Spear's case at the Rule 41(b) hearing. The district court stated that there is no evidence concerning what happened between the filing of his application in 1978 and his part-time hire in September of 1983. The court also stated that it was evident that his application was re-reviewed by MARTA. Because we are remanding with respect to certain plaintiffs who applied for bus operator positions, we remand Spear's case also. Appellants' brief does not help us understand what his claim is, but presumably he seeks damages for the delay in his hiring.

*Charles G. White*

White's application for the bus operator position was filed on May 25, 1979. It appears complete upon our review and contains no information that would on its face disqualify him. Like most of the other plaintiffs, he received the two letters from MARTA in July and September of 1980. MARTA's counsel made no argument with respect to White. The district court stated that White was rejected on initial review of his application and that there is nothing to show what happened when his application was re-reviewed.

Three plaintiffs—*Carolyn Baker, Winston Rollock,* and *Thomas Reid* fall into one category. They did not testify but their applications and other documents were received and the district court considered their cases without oral testimony. With respect to Baker, the court found that her application was final on February 14, 1979 "and she would fall in the same class with those whose applications should have been rereviewed." Rollock's application was submitted September 10, 1979, and Reid's was submitted July 30, 1979. The district court found that Rollock and Reid fell into the same category as Baker.

We have reviewed these plaintiffs' applications and do not find any reason for their rejection. Each received the follow-up letters from MARTA. The only possible distinction is that Reid's documents show that he might have been interviewed on what appears to be November 23, 1979, and the initials B.D. appear beside the notation of the interview. At the top of the form is a note "11–23–79. No interest at this time. B. Dorsey."

Because the district court did not make a finding as to why the following plaintiffs were denied relief with respect to their applications for bus driver, we remand the cases of *David Johnson, Clifford Mitchell,* and *Alvin Shorts* for an adjudication of their claims. We remand *Harry Terrell*'s case for a slightly different reason. He

applied June 1, 1979. His application was rejected for no apparent reason. Although the district court found that he became disabled in 1984, the court did not hold that there was any valid reason for his not being considered initially, and he might be entitled to damages for the failure to employ him before he became disabled.

With respect to the foregoing applicants for the position of bus operator, we reverse and remand to the district court on the ground that the court erred in granting MARTA's motion to dismiss. We conclude that these plaintiffs at a minimum established a prima facie case of discrimination. Our holding goes no further and we intimate nothing with respect to what the ultimate outcome of these plaintiffs' cases should be.[10]

■ We now review the cases of those plaintiffs who applied for bus operator position but who were appropriately denied relief. *Keith Lewis, James McDaniel* and *Jimmy Purvis* applied for the position between November 15, 1979 and December 31, 1979. MARTA was still accepting bus operator applications, but corrective actions had begun by that time, and thus they cannot claim the benefit of either the applicant flow chart or the discriminatory advancement of those who did make the QA list.

*Nathaniel Nixon* did not testify, but unrebutted testimony was elicited that he had a drug addiction. *Samuel Andrews* became totally disabled in 1979 or 1980 and at the time of trial was the recipient of Social Security insurance benefits. Thus, neither of these plaintiffs can be considered qualified at the time their application was submitted and rejected.

*William Carmack, Michael Fuller, Clarence Knighton,* and *Maurice Mobley* failed the validated test battery. This indicates that they did not face discrimination in reaching the QA list and simply were not qualified. *Alpha Ameen* did not report to

take the test when notified, and thus he was not qualified.

The application of *Fletcher Thomas* was incomplete for failure to fill out health information and driver's information, and the district court was correct in denying him relief for that reason. *Willie Benton*'s application was incomplete in that he did not sign it or enter the date.

The foregoing discussion of applicants embraces all of those who applied for the position of bus operator and the findings of the district court with respect to each based on testimony at the evidentiary hearing. We affirm the district court's dismissal of their claims. Seven other plaintiffs who did not apply for the position of bus operator were considered as a result of the bench trial and these applicants will now be discussed.

■ *Arneatha Clark* applied for the position of MARTA checker, *Evelyn Hill* and *Authorine Pettway* sought positions as clerks, *James Hill* sought a position as transit police officer, *Larry Wilcoxson* sought a position as junior apprentice and serviceman, and *James Young* sought a position as an accountant. The district court properly rejected these claims. Plaintiffs did not show that there were any openings for these positions, did not show what the minimum qualifications were, and presented no statistical evidence relevant to their claims. Consequently, they failed to make out a prima facie case of employment discrimination.

*Alvin Lewis'* case was dismissed for failure to present any evidence. He neither testified nor complied with the discovery rules. *Sandra Saunders'* case was dismissed for her failure to testify and failure to present any evidence that she had applied. *Ronald Witherspoon*'s case fell in the same category. All of these were properly dismissed by the district court.

---

**10.** We recognize that the Title VII claims of some of these plaintiffs were found by the district court to be barred by Title VII's 180–day requirement. Their claims under sections 1981 and 1983, however, were not found barred, and,

as discussed below, the evidence necessary to sustain Title VII disparate treatment claims and claims under section 1981 and section 1983 is identical.

## IV. THE STATUTES OF LIMITATIONS

Several of the plaintiffs claim that the district court erred in finding their Title VII, section 1981, or section 1983 claims barred by the statutes of limitations applicable to such claims. We will address here only the appeals of those plaintiffs—*Henry Burton, Hazel Hill Culbreath, Juanita Nixon, Harriett Outlaw,* and *Constello Williams*—who were found barred from making *all* of their claims—whether under Title VII, section 1981, or section 1983—because those plaintiffs who were barred under Title VII but not under sections 1981 and 1983 were still eligible to proceed with the latter claims on essentially the same proof. *See Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir.1985) (legal elements of Title VII claims predicated on disparate treatment, section 1981, and section 1983 claims are identical).

### A. *Title VII's 180–Day Filing Requirement*

■ Title VII requires that any employee invoking the statute's protection file a charge with the EEOC within 180 days of the date he or she was discriminated against. 42 U.S.C. § 2000e–5(e) (1982). The 180 days begins running from the date the employee knows or reasonably should know that he or she has been discriminated against. *Stafford v. Muscogee County Board of Education,* 688 F.2d 1383, 1387 (11th Cir.1982); *McWilliams v. Escambia County School Board,* 658 F.2d 326, 328 (5th Cir. Unit B Oct. 1981). The purpose of the requirement is to "put defendants on notice of adverse claims and prevent plaintiffs from sleeping on their rights." *Parker v. Crown Cork & Seal Co.,* 462 U.S. 345, 353, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983); *see also Kilgo v. Bowman Transportation Co.,* 789 F.2d 859, 877 (11th Cir.1986).

In cases involving multiple plaintiffs, it is not always necessary that every plaintiff have filed a charge with the EEOC. Under the "single filing rule," plaintiffs who have not themselves filed may rely on the filing of a co-plaintiff if the claims of the filing and non-filing plaintiffs have arisen out of

similar discriminatory treatment in the same time frame. *Griffin v. Dugger,* 823 F.2d 1476, 1492 (11th Cir.1987) (quoting *Jackson v. Seaboard Coast Line Railroad,* 678 F.2d 992, 1011–12 (11th Cir.1982)); *Ezell v. Mobile Housing Board,* 709 F.2d 1376, 1381 (11th Cir.1983). The charge of the filing plaintiff must be timely and otherwise not defective. *Allen v. United States Steel Corp.,* 665 F.2d 689, 696 (5th Cir. Unit B 1982).

MARTA does not argue that the EEOC charge filed by James Hill on September 16, 1980 was untimely or defective. The question thus is whether these five plaintiffs suffered discriminatory treatment similar to Hill's and within the same time frame. We are not persuaded that they did. Although all five complain generally that they were not hired, as Hill does, that is the extent of the commonality between their claims and Hill's. Henry Burton and Hazel Hill Culbreath contend that they were denied applications. Juanita Nixon, Harriett Outlaw, and Constello Williams all claim that they were told either immediately upon or soon after applying that they would not be hired. The heart of James Hill's claim, by contrast, was his allegation that black applicants were illegally being denied their rightful places on the QA list and then were never told what happened to their applications. More importantly, all five of these plaintiffs experienced the discrimination they allege at an identifiable point in time prior to the directive from MARTA's Board of Directors that, as shown above, was a crucial piece of evidence in Hill's attempt to prove discriminatory intent. The combination of these facts convinces us that these plaintiffs did not suffer discriminatory treatment similar to Hill's and in the same time frame.

### B. *The Section 1981 and Section 1983 Claims*

With respect to these plaintiffs' section 1981 and section 1983 claims, our conclusion is much less difficult. Recent Supreme Court decisions have directed that the appropriate statute of limitations for both types of actions is the personal injury

statute of the state in which the federal court is sitting. *Goodman v. Lukens Steel Co.*, —— U.S. ——, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987); *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 1949, 85 L.Ed.2d 254 (1985). In Georgia, personal injury actions must be brought within two years. O.C.G.A. § 9–3–33 (1982). All of these plaintiffs failed to bring their actions within two years. The complaint was filed on February 17, 1981, and the latest act of discrimination alleged by any of these plaintiffs is October 1978.

We affirm the holdings of the district court that the Title VII, section 1981, and section 1983 claims of Henry Burton, Hazel Hill Culbreath, Juanita Nixon, Harriett Outlaw, and Constello Williams are barred by the applicable statutes of limitations.

## V. CONCLUSION

In Case No. 85–8845, we affirm as to certain named plaintiffs and reverse and remand as to certain plaintiffs as particularized in the foregoing opinion.

In Case No. 86–8026, MARTA's appeal from the district court's denial of its motion for attorney's fees, we affirm. We do not fault counsel for including plaintiffs in the original complaint whose cases failed after discovery. However, we cannot understand counsel's pursuit of the appeal of the cases of those plaintiffs who were not seeking the position of bus operator. We found not an iota of evidence that supported these claims. Our affirmance of the denial of attorney fees by the district court does not preclude MARTA from filing a motion for fees on appeal as to a portion of the case.

AFFIRMED in part, REVERSED and REMANDED in part.